Edward A. KLOSTERMAN and Debbie A. Klosterman, Plaintiffs–Appellants,

v.

WESTERN GENERAL MANAGEMENT, INC., a Delaware Corporation, Defendant–Appellee.

No. 93–2623.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1994.

Decided Aug. 12, 1994.

John Doyle, Nancy Ginsberg Ross (argued), Christine M. Drylie, McDermott, Will & Emery, Chicago, IL, for Edward and Debbie Klosterman.

Thomas H. Fegan, William G. Beatty, Marilyn McCabe Reidy (argued), Johnson & Bell, Kenneth M. Brown, Neal, Gerber & Eisenberg, Chicago, IL, for Western General Management, Inc.

Before WOOD, Jr., COFFEY, and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Edward and Debbie Klosterman ("appellants") appeal a district court order entering summary judgment against them on each count of their complaint against Western General Management, Inc. In their complaint, brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), the appellants sought recovery for medical expenses incurred during the treatment of their son Brent, who suffered, and eventually died from leukemia.

I.

Against a backdrop of national concern and debate over the state of health care insurance in our country comes this latest tale of a family who learned that, when they needed it most, the health insurance plan they paid for and depended upon ceased to exist, without notice or warning. In November of 1989 Edward Klosterman began working for the Prairie Maize Company. At that time he and his eligible dependents began participating in the Prairie Maize Employee Health Benefit Plan ("the plan"). The plan was partially self-funded with Guarantee Mutual Life Insurance Company ("Guarantee Mutual") being the excess carrier. The plan listed Sharon Baldinger, Prairie Maize Human Resource Manager, as the plan administrator. The role of Western General in the development and operation of the plan is the central issue in this appeal.

Western General's primary business is that of a claims administration company. In fact the plan involved here listed it as the "Third Party Administrator" for the plan. In 1988 Don Fallon, an insurance broker, began working as a business developer for Western General. Shortly thereafter he acquired Prairie Maize as a prospective client. After reviewing the quotes and information that

Fallon provided regarding partially self-funded plans, Prairie Maize agreed to develop the plan with Guarantee Mutual as the excess carrier. Prairie Maize also signed a service agreement with Western General for claims administration services. Western General was to process claims "in accordance with the claims procedures and standards established by [Prairie Maize]." Western General prepared a computer program, incorporating the parameters and guidelines of the plan, to assist it in making initial claims and coverage determinations. It also referred to other documents, not provided by Prairie Maize, when making those initial determinations.

While the plan was in the formative stages, Western General assisted Prairie Maize in completing the Summary Plan Description ("SPD"), a document that describes the parameters of the plan and benefit information. ERISA requires that the plan administrator include certain information in the SPD and provide the SPD to all participants. Western General obtained a boilerplate form SPD from Guarantee Mutual. Prairie Maize then indicated what specific terms it wanted included or changed in that form. After making those changes Western General submitted the SPD to Prairie Maize for its review and approval, then released the printed SPD.

In August of 1990, after working for Prairie Maize and participating in the plan for nearly one year, Ed Klosterman lost his job. At that time he elected to continue his health insurance as provided under the plan. The SPD stated that he could continue his coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). The SPD further provided that if the COBRA coverage terminated the participant had the right to convert to an individual policy. This conversion coverage would become effective on the day after COBRA coverage terminated, provided that the participant sent in an application for conversion and a premium payment. Nothing in the SPD indicated that this apparently unconditional right to convert would terminate if the underlying plan terminated or if Prairie Maize went out of business.

Ed Klosterman paid his premiums for the COBRA coverage for the months of September, October and November. On November 8, 1990, the Klosterman's son Brent was admitted into Children's Memorial Hospital. Debbie Klosterman called Western General to determine if Brent's hospital care would be covered. Western General informed her that her son was completely covered and no pre-certification was necessary. Brent was diagnosed with chronic myelogenous leukemia. Four days later, before Brent was discharged from the hospital, the Klostermans learned that they no longer had COBRA insurance coverage. When Debbie Klosterman contacted Prairie Maize she learned the reason they had no coverage. Prairie Maize had gone out of business and terminated all of its insurance retroactive to October 31, 1990. Although Prairie Maize did not notify Western General of this in writing until sometime after November 7, a memorandum circulated at Western General indicated that officials there were aware of the insurance termination as early as November 5, three days prior to the time Debbie Klosterman was assured that her son's treatment would be covered.

Debbie Klosterman then requested to convert to an individual policy. Jean Horner, at Western General, told her that she was unfamiliar with the procedures for conversion but would look into it. She later sent Mrs. Klosterman the requisite forms for conversion that she had received from Guarantee Mutual. The Klostermans completed the forms and paid the premium. Nevertheless, Guarantee Mutual, the company through which the conversion coverage would be offered, denied the Klostermans' application. Brent Klosterman later died as a result of the leukemia. Having been denied insurance coverage the Klostermans suffered not only the personal loss of their son but also a catastrophic financial burden in the form of unpaid medical bills.

## II.

The appellants brought a three-count complaint against Western General pursuant to ERISA. In Count I they allege that Western General violated ERISA's disclosure requirements by failing to include in the SPD the fact that conversion coverage would not

be available if the underlying plan terminated. 29 U.S.C. § 1022(b). In Count II they allege that Western General is equitably estopped from denying coverage because the Klostermans relied upon the representations in the SPD and also directly from Western General employees, that conversion coverage was available. Finally they allege in Count III that Western General has breached its fiduciary duties under ERISA. The district court granted summary judgment in favor of Western General on all counts. We review that grant *de novo*. *PPG Indus. v. Russell*, 887 F.2d 820, 823 (7th Cir.1989).

## A.

### Disclosure Violations

■ ERISA does indeed impose a requirement that the SPD describe the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). Furthermore the SPD must be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id.* In this case the appellants argue that the SPD was incomplete and inaccurate. The SPD stated that when a participant's continuation coverage under COBRA expires that participant

> may obtain medical care conversion [coverage].... A person's benefits under the medical care conversion coverage will be effective [the day after continuation coverage terminates], provided that [the insurance company receives the application and the first premium payment]. The insurance company governs the form of coverage, the benefits and amounts.

The SPD does not mention that if the underlying plan terminates, the right to conversion coverage terminates as well. We need not decide whether this alleged omission renders the SPD inaccurate or otherwise in violation of the statute; we may assume that it does. Nevertheless, Western General, the only defendant, cannot be held liable for any inaccuracies in the SPD. Congress has explicitly provided that the responsibility for complying with these statutory requirements falls on the plan administrator.

29 U.S.C. § 1021(a), (b). The case law also confirms that any cause of action for violations of these disclosure requirements is proper only against the plan administrator, the party responsible under the statute. *See Moran v. Aetna Life Ins. Co.*, 872 F.2d 296, 298–99 (9th Cir.1989); *Davis v. Liberty Mut. Ins. Co.*, 871 F.2d 1134, 1138 (D.C.Cir.1989); *Bass v. Prudential Ins. Co. of Am.*, 764 F.Supp. 1436 (D.Kan.1991). ERISA makes clear that the plan administrator is the "person specifically so designated by the terms of the instrument under which the plan is operated...." 29 U.S.C. § 1002(16)(A). In this case that person was Sharon Baldinger of Prairie Maize, not Western General.

## B.

### Breach of Fiduciary Duties

■ Next the Klostermans argue that Western General is liable because they breached fiduciary duties by: 1) failing to inform the participants of all circumstances which could result in loss of coverage; and 2) failing to inform the participants of the plan termination effective October 31, 1990 and the resultant loss of coverage. A claim for a breach of fiduciary duties under ERISA is only valid against a "fiduciary." 29 U.S.C. §§ 1105(a), 1109(a). A fiduciary of a plan is defined as anyone who "exercises any discretionary authority or discretionary control respecting management of such plan ... or has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Furthermore a person deemed to be a fiduciary is not a fiduciary for every purpose but only to the extent that he performs one of the described functions. *Johnson v. Georgia–Pacific Corp.*, 19 F.3d 1184, 1187 (7th Cir.1994).

### 1.

■ Here the Klostermans contend that three activities exhibit Western General's discretionary control or authority over the administration of the plan. First they contend that Western General had discretionary control over the establishment, implementation, and monitoring of the plan. Specifically they argue that the activities of Don Fallon, the Western General business developer, in

setting up the plan between Prairie Maize and Guarantee Mutual, and later encouraging Prairie Maize to renew with Guarantee Mutual, exhibit discretion. Fallon testified in depositions that he obtained insurance quotes from excess carriers and contacted potential clients discussing the benefits of partially self-funded plans and the services Western General could provide. He would prepare spread sheets and give presentations to the companies about different insurers and their rates. In this case Prairie Maize decided to begin a partially self-funded plan and work with Western General and Guarantee Mutual. When the time came for renewal of the plan Fallon was again involved and presented quotes to Prairie Maize regarding insurance carriers.

None of this activity evidences the slightest discretion respecting the administration of the plan. Even assuming that one can have authority to administer a plan that does not yet exist (which would be required to find discretionary authority related to bringing the two companies together) all decisions of whether to begin the plan with Guarantee Mutual or not were made by Prairie Maize. *See American Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y*, 841 F.2d 658, 664 (5th Cir. 1988) (holding that an insurance company's action in advising a fund to set up a self-funded plan did not render it a fiduciary because the insurance company had no control over whether the fund would accept the advice).

The record contains no indication that Don Fallon had the authority to decide whether Prairie Maize would develop the partially self-funded plan. "[T]he power to act for the plan is essential to status as a fiduciary under ERISA." *Associates in Adolescent Psychiatry v. Home Life Ins. Co.*, 941 F.2d 561, 570 (7th Cir.1991) (holding that certain professionals who advised the plan were not fiduciaries because they had no "decision-making authority over the plan."), *cert. denied*, — U.S. —, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992). Fallon's activities were identical to that of a broker or salesman introducing two different organizations who needed each other's services and did not

render him a fiduciary. *See Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir.1989) (holding that a securities firm that recommended securities for a plan to purchase was merely a broker, not a fiduciary, in part, because the firm had no discretionary authority over the plan; rather it merely "match[ed] customer's desires with available inventory").

The appellants suggest that this case is analogous to *Brock v. Hendershott*, 840 F.2d 339 (6th Cir.1988), in which the court held a union representative liable as a fiduciary for influencing the union's decision to select a particular dental association for its plan. The cases are actually dissimilar. In *Brock*, the union official was a very high-ranking individual with considerable influence over the union. He also owned a personal stake in the particular dental association and profited from the union's choice to use that association. In one instance he actually took over as the bargaining representative for the union. *Id.* at 342. Here Fallon played no such role. He was compensated for his services, but he did not have a personal stake in either Prairie Maize or Guarantee Mutual. He would have received his commission from Western General for bringing any two companies together. Furthermore he did not possess the influence over decision makers that the union official in *Brock* possessed (as evidenced by the official's action of taking over as a bargaining representative). The activities of Western General and Fallon in setting up Prairie Maize with Guarantee Mutual or in presenting insurance quotes and making recommendations at the time of renewal are insufficient as a matter of law to render Western General a fiduciary with respect to the plan.

2.

■ The second allegedly discretionary activity the Klostermans allege was Western General's role in the preparation of the Summary Plan Description. Assuming for the purposes of analysis that the preparation of a Summary Plan Description is an activity that relates to the "administration" or "management" of the plan, Western General's involvement in the preparation was not akin to

discretionary authority or control; therefore, it is not a fiduciary. The vast majority of the language in the SPD was supplied to Western General by Guarantee Mutual by way of a standard form. Prairie Maize then directed Western General to alter certain terms (co-payment and deductibles, e.g.) and "insert" certain other terms including the benefit information. Western General then transferred the basic Guarantee Mutual form with the Prairie Maize changes into a word processor. The final product was subject to review and approval by Prairie Maize. In the words of Jean Horner, the role of Western General in the preparation of the SPD was that of a "go between." Based on the information in the record there is no material question of fact here. Western General had no discretionary authority or control with respect the SPD; its responsibilities were purely clerical and thus insufficient to render it a fiduciary. *See Pohl v. National Benefits Consultants, Inc.*, 956 F.2d 126, 129 (7th Cir.1992) (holding that a party who performs only clerical or ministerial tasks is not a fiduciary under ERISA).

### 3.

■ Finally, the appellants contend that Western General exercised discretionary authority in adjudicating claims for benefits. Western General was responsible for initial claims determinations. To aid in making those determinations it developed a computer program based on the parameters of the plan. It would then rely on that program. When the program could not provide the necessary determination, Western General would often use manuals and other printed information, not provided by Prairie Maize, in making the determinations. Western General often reviewed the SPD as well when making claims determinations. These activities, however, do not demonstrate discretionary authority. Prairie Maize, not Western General, retained the authority to make the ultimate decisions in all doubtful or contested claims and all claims in which legal actions were proceeding. Therefore, if there was any questionable or doubtful call to be made, Western General did not have the authority to make a final decision. Furthermore, the use of a computer program and the

review of the SPD were attempts to carry out claims responsibility as uniformly as possible within the framework of the plan developed by Prairie Maize. Western General had the duty of processing and paying claims "in accordance with the claim procedures and standards established by the employer."

Decisions from several other circuits support our conclusion that the activities performed by Western General as a claim administrator did not involve discretionary authority as that term is used in ERISA. In *Baker v. Big Star Div. of Grand Union Co.*, 893 F.2d 288 (11th Cir.1989), the court rejected a claim that a claims administrator was a fiduciary under facts similar to those here. Much like this case, in *Baker*, the administrator was to "review claims and determine the amount payable 'in accordance with the terms and conditions of the plan.'" *Id.* at 290. The court held that

an insurance company does not become an ERISA "fiduciary" simply by performing administrative functions and claims processing within a framework of rules established by an employer ... especially if, as in this case, the claims processor has not been granted the authority to ... make the ultimate decisions regarding eligibility.

*Id.* (citations omitted). Here although Western General developed the computer program that formed the main method of determining eligibility, they did not create it out of thin air. It was based upon the framework of rules (i.e., the plan) established by the employer. Furthermore when discretion truly was required, in questionable cases, the ultimate decision belonged to Prairie Maize. *See Kyle Rys. v. Pacific Admin. Servs.*, 990 F.2d 513, 516 (9th Cir.1993) (holding that a third party administrator is not a fiduciary under ERISA when it performs only ministerial functions and must refer all discretionary questions regarding payment of claims to the employer).

The decisions upon which the Klostermans rely to support their argument are inapposite to this case. In *Buehler Ltd. v. Home Life Ins. Co.*, 722 F.Supp. 1554 (N.D.Ill.1989), the court found a claims administrator to be a fiduciary because it "exercised some (indeed,

most likely complete) authority to grant or deny benefits." *Id.* at 1563 (emphasis added). Furthermore, the court noted that the employer did not retain any authority to review processed claims. *Id.* at n. 14. That fact stands in stark, irreconcilable conflict with the facts of this case. Similarly in *Libbey–Owens–Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031 (6th Cir.1993), the court found an insurance company to be a fiduciary relative to its activities as a claims administrator only after noting that it "retained authority to resolve all disputes regarding coverage." *Id.* at 1032. Again Western General did not possess such authority; all questionable claims were subject to review by Prairie Maize. Therefore these cases do not call into question our holding that the activities and responsibilities of Western General in administering claims as a matter of law do not amount to discretionary authority and it is not a fiduciary.[1]

## C.

■ Finally in Count II of the appellants' complaint they allege that Western General should be equitably estopped from denying coverage because: 1) it prepared the SPD which failed to mention that conversion coverage would not be available if the underlying plan terminated; 2) it represented to Debbie Klosterman that she could convert to an individual policy.[2]

The first argument must fail because there is no question of fact involved and it is clear that Western General performed only clerical duties with regard to the SPD. *See* section II.B.2. Therefore they bear no responsibility for the SPD.

■ The second argument must also fail. The appellants contend that Jean Horner at Western General represented to them that they could convert to an individual policy. They have failed, however, to offer any evidence to show that the defendant made such a representation. After learning that the hospital was not able to confirm coverage for Brent, Debbie Klosterman made several investigatory telephone calls. She called Sharon Baldinger at Prairie Maize who informed her that Prairie Maize had canceled all insurance but the Klostermans could convert to an individual policy. Debbie Klosterman then called Jean Horner at Western General. She mentioned the right to convert to Ms. Horner. Ms. Horner then told her that she "didn't have a lot of information about the conversion but that she would check and call ... back." When she called back she informed Mrs. Klosterman that she had spoken with Lori Shoriet at Guarantee Mutual and explained what she was told about a right to convert. According to Mrs. Klosterman's own deposition testimony, **Ms. Shoriet** "told Jean that, yes, that was true [conversion coverage was available]." Jean Horner never made any representation that the Klostermans had a right to convert. At most the record reflects that she merely relayed what Lori Shoriet had said. The representation, if any, was made initially by Sharon Baldinger at Prairie Maize and later by Lori Shoriet at Guarantee Mutual. Because the appellants would bear the burden of proof on this issue

1. The remainder of the cases cited by the plaintiffs are also not useful to our analysis. They cite *American Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y*, 841 F.2d 658 (5th Cir.1988), for the proposition that authority to grant or deny claims will result in fiduciary status. The holding of that case is not so broad. In that case the insurer's agent became a fiduciary only after he was named the Fund Administrator, which job carried with it the significant discretionary control over the management and disbursement of fund assets. *Id.* at 663. In *Yeseta v. Baima*, 837 F.2d 380 (9th Cir.1988), the court found a corporate officer to be a fiduciary because he personally withdrew two large lump sums of cash from the plan's accounts. *Id.* at 386. No such activity was alleged against Western General. Finally, in *Mutual Life Ins. Co. of New York v. Yampol*, 840

F.2d 421 (7th Cir.1988), we concluded that a state-appointed liquidator of a plan was a fiduciary. *Id.* at 427. Among other things, the liquidator had the power to: sell or dispose of personal and real property; compromise uncollectible debts; solicit, negotiate, and draft contracts to have companies assume liabilities owing to the trust; and use the assets of the trust to reinsure. *Id.* at 424. Again the powers of the liquidator in that case are vastly different from those vested in Western General.

2. Although the appellants identify another representation, that Brent's treatment would be covered under the existing plan, they do not argue that that statement forms the basis for an estoppel claim.

at trial, once Western General showed that there was an absence of evidence to support this claim, the burden fell on the appellants to introduce some form of evidence showing a genuine question of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As we mention above nothing in the record creates a question of fact or even suggests that Jean Horner made the alleged representation. Therefore Western General is entitled to summary judgment on this claim.

### III.

Although the facts of this case present a compelling and tragic story, we must conclude that the appellants' claims against Western General cannot succeed as a matter of law. The decision of the district court is therefore

AFFIRMED.