In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3476

CHICAGO DISTRICT COUNCIL OF
CARPENTERS WELFARE FUND,

*Plaintiff-Appellant,*

*v.*

CAREMARK, INCORPORATED and
CAREMARK RX, INCORPORATED,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 5868—**John W. Darrah,** *Judge.*

ARGUED MARCH 31, 2006—DECIDED JANUARY 19, 2007

Before ROVNER, EVANS and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* The Chicago District Council of
Carpenters Welfare Fund ("Carpenters") sued Caremark,
Inc. and its parent company Caremark Rx, Inc. (collec-
tively "Caremark") for breach of fiduciary duties under
29 U.S.C. § 1106(b) of the Employee Retirement Income
Security Act of 1974 ("ERISA").[1] The district court deter-

---

[1] Carpenters also brought two state law claims against Care-
mark, one for breach of contract and one for violating the Illinois
(continued...)

mined that Caremark was not an ERISA fiduciary and therefore granted Caremark's motion to dismiss. We affirm.

## I.

We take the facts as presented in the Complaint. Carpenters provides healthcare benefits to the members of a labor union. One of the benefits provided is prescription drug coverage which entitles the union members to obtain brand name or generic prescription drugs for a small co-payment. Carpenters pays the rest of the cost. In order to manage this benefit, Carpenters entered into a series of contracts with Caremark, Inc., one of the nation's largest Pharmaceutical Benefit Management ("PBM") companies.[2] There are three such contracts in the record, signed in 1996, 1999, and 2003. Each covers a multi-year period. The first two contracts are between Caremark and Carpenters directly; we will refer to these as the "1996 Contract" and

---

[1]  (...continued)
Consumer Fraud and Deceptive Practices Act. After dismissing the ERISA count, the district court dismissed the state law counts for lack of subject matter jurisdiction. Carpenters does not appeal from the dismissal of the state law claims.

[2]  Caremark Rx, Inc. is not a party to any of the three contracts. Rather, it is the parent corporation of Caremark, Inc. Like the district court, we do not find it necessary to decide whether Caremark Rx, Inc. should be dismissed from the case solely on the basis that it was not a party to any of the relevant contracts. As a factual matter, though, we note that Caremark Rx, Inc. does not appear in any of the contracts or in any of the specific allegations of the complaint, except to be identified as the parent corporation. Because all of our reasoning would apply equally to the parent corporation, we will refer to the two companies collectively as Caremark henceforth.

the "1999 Contract" respectively. The third agreement was executed in two parts: first is a contract between Caremark and Midwest Employee Benefit Fund Coalition, an organization of which Carpenters was a member. In the second part, Carpenters entered into a Participating Group Agreement with Caremark that set specific terms for services covered and prices. Together we will refer to those last two agreements as the "2003 Contract."

**A.**

The parties disagree about the nature of Caremark's obligations under the contracts. Carpenters portrays Caremark as its fiduciary, responsible for, among other things, negotiating prices with retail pharmacies and drug manufacturers on behalf of Carpenters. Caremark claims only to have agreed to provide the stated benefits at prices determined via arm's-length negotiations between Caremark and Carpenters. Carpenters attached to the Complaint the three contracts at issue, and under the Federal Rules of Civil Procedure, those contracts are considered parts of the pleading. Fed. R. Civ. Pro. 10(c); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). We may thus turn to the contracts to determine the nature of the agreement. To the extent that the contracts contradict the Complaint, the contracts trump the facts or allegations presented in the Complaint. *Flannery v. Recording Indus. Assoc. of Am.*, 354 F.3d 632, 638 (7th Cir. 2004); *Thompson v. Illinois Dept. of Prof. Regulation*, 300 F.3d 750, 754 (7th Cir. 2002); *Perkins v. Silverstein*, 939 F.2d 463, 469 n.4 (7th Cir. 1991) (in determining the sufficiency of the complaint, the court may rely on exhibits to the complaint whenever the allegations of the complaint are materially inconsistent with those exhibits). Under each of these contracts, Caremark was obliged to provide a

variety of services to the covered union members. For example, Caremark was obliged to provide a mail service pharmacy, access to a network of retail pharmacies, claims processing, a formulary program, customer service phone lines, and maintenance of records. Caremark contracts with 55,000 retail pharmacies and operates four automated and nineteen mail-order pharmacies in order to process prescriptions for its clients. Each contract also provided that Caremark was not a fiduciary as that term is defined by ERISA, and that Carpenters possessed the sole authority to control and administer the plan.

Nonetheless, Carpenters alleges that, under the three contracts, Caremark has discretionary authority over the management and administration of Carpenters' drug benefit plan and also exercises discretion and control over Carpenters' assets. This discretionary authority gives rise to fiduciary duties under ERISA, Carpenters reasons. In particular, Carpenters alleges that Caremark has discretion (and therefore fiduciary duties) in four specific areas: (1) in negotiations with drug retailers over drug prices; (2) in negotiations with drug manufacturers over rebates and other discounts; (3) in the management of the formulary program; and (4) in the management of the drug switching program. We turn to the contracts to set out the terms in each of these areas.

## 1. Drug Prices

Each contract contains a similar paragraph setting out the costs associated with retail pharmacy services. The 1996 Contract provided:

> Retail Pharmacy. For each prescription, a total net effective rate of the lesser of (x) the retail pharmacy's usual and customary prices or (y) AWP less 13% for

brand-name drugs or (ii) HCFA MAC, as expanded by Caremark, for generic substitutes, as appropriate, plus a dispensing fee of $2.25, less the Covered Member co-payment as established by [Carpenters]. The above prices are based on the participation of a full and complete Caremark pharmacy network. Caremark will use its best commercially reasonable efforts to negotiate these rates with existing pharmacies in [Carpenters'] network. In the event of changes in the marketplace beyond Caremark's control resulting in a reduction in the number of participating pharmacies or in contract reimbursement rates for this network, pricing will be adjusted to reflect these changes.

1996 Contract, ¶ 4(a)(ii). The 1999 Contract similarly provided:

Retail Pharmacy. For each Prescription billed to [Carpenters], electronically processed and dispensed to a Covered Member through Caremark's retail pharmacy network, [Carpenters] shall pay Caremark AWP less 13.5% for brand-name drugs or AWP less 55% for MAC generic substitutes, as appropriate, plus a dispensing fee of $2.50, less the Covered Member copayment as established by [Carpenters]. [Carpenters] shall also pay any applicable sales or use tax. The above prices are based on the participation of a full and complete Caremark retail pharmacy network. Caremark shall use commercially reasonable efforts to negotiate these rates with existing pharmacies in [Carpenters'] retail network. In the event of changes in the marketplace beyond Caremark's control resulting in a reduction in the number of participating pharmacies or in contract reimbursement rates for this retail network, pricing shall be adjusted to reflect these changes.

1999 Contract, Ex. A, ¶ 2. Finally, the 2003 Contract sets out a similar set of terms:

Retail Pharmacy. For each Prescription billed to [Carpenters], electronically processed and dispensed to a Covered Member through Caremark's retail pharmacy network, [Carpenters] shall pay Caremark: (i) for Brand Drugs, the lower of Usual and Customary Price or AWP less 15%, or (ii) for Generic Drugs AWP less 55%; plus in each case a dispensing fee of $2.05 for Brand Drugs and $2.20 for Generic Drugs, and less the Covered Member Copayment as established by [Carpenters]. [Carpenters] shall also pay any applicable sales or use tax. The Covered Member Copayment for each electronically processed retail Prescription shall be the lesser of the Covered Member Copayment as established by [Carpenters] or the pharmacy's usual and customary charge. The above prices are based on the participation of a full and complete Caremark retail pharmacy network. Caremark shall use commercially reasonable efforts to negotiate these rates with existing pharmacies in [Carpenters'] retail network. In the event of changes in the marketplace beyond Caremark's control resulting in a reduction in the number of participating pharmacies or in contract reimbursement rates for this retail network, pricing shall be adjusted to reflect these changes. Such pricing adjustments will take effect only after Caremark provides at least thirty (30) days written notice of its intention to adjust pricing and upon Coalition's written agreement of such price increases.

2003 Contract, Ex. A, Section 1, ¶ 2.

There are a number of defined terms in these provisions that require explanation. "AWP" refers to the average wholesale price for a prescription drug as reported in First Data Bank or other nationally available reporting service of pharmaceutical prices. "Usual and Customary Price" refers to the retail price charged by a participating pharmacy for the particular drug in a cash

transaction on the date the drug is dispensed as re-ported by the participating pharmacy to Caremark. "HCFA" is the Health Care Financing Administration, a federal agency that administers Medicare and Medicaid services. It is now known as the Centers for Medicare and Medicaid Services. "MAC" is the maximum allowable cost that the federal government will pay under Medicare and Medicaid for a generic drug. HCFA did not list a MAC price for every available generic drug. Carpenters avers in its Complaint that the phrase "HCFA MAC, as expanded by Caremark" obligated Caremark to calculate the price for these unlisted generic drugs using the formula that HCFA used to generate MAC pricing and offer Carpenters at least as favorable a price as an HCFA calculation would yield. According to Carpenters, these provisions gave Caremark the duty and the discretion to use commercially reasonable efforts to negotiate the prices Carpenters would pay retailers for filling union members' prescriptions.

## 2. Rebates

The 1996 Contract provided that Caremark would pay Carpenters a $1.50 rebate for each mail order prescription and a $0.75 rebate for each retail prescription filled. Caremark would be relieved of this obligation if Caremark was "no longer eligible to receive rebates from pharmaceutical manufacturers' rebate programs." Under the 1999 Contract, Caremark was similarly obliged to pay Carpenters a $1.50 rebate for mail order prescriptions and a $1.00 rebate for retail prescriptions filled except that no rebates were due for generic prescriptions. As in the 1996 Contract, Caremark was not obliged to pay the rebate if the manufacturers were no longer allowing Caremark to participate in a rebate program. Additionally, the 1999 Contract provided that Caremark would hold all con-

tracts relating to rebates with the pharmaceutical manufacturers and that Carpenters agreed not to enter into contracts directly with drug makers relating to the services provided under the 1999 Contract. The 2003 Contract changed the amount due as rebates for each mail order and retail prescription filled, removed the exception for generic drugs mentioned in the 1999 Contract, and retained the language explaining that Caremark would hold all contracts with drug makers relating to rebates and that Carpenters would not enter into contracts directly with those manufacturers. In the "Formulary Program" provisions, the 2003 Contract also stated that:

> Caremark may hold contracts with the manufacturers of products covered under this Agreement and in connection with such contracts, Caremark may have a financial relationship with such manufacturers and may receive rebates from such manufacturers.

Nothing in the 2003 Contract relieved Caremark of the duty to pay rebates to Carpenters, even if the manufacturers deemed Caremark ineligible to receive rebates. Carpenters argues that these various rebate provisions delegated to Caremark discretionary authority over the negotiations of drug purchase agreements with drug manufacturers on Carpenters' behalf. This discretion gave rise to fiduciary duties, according to Carpenters. Moreover, Carpenters contends that the provisions gave Caremark control over Carpenters' assets, namely over the portion of rebates paid by drug makers that "belongs to Carpenters." This control over assets, Carpenters contends, also gave rise to fiduciary duties.

### 3. Formulary Programs

Carpenters also argues that Caremark is a fiduciary because it exercises discretion in the management of its

formulary program, including control over the content of the formulary and over the drug-switching program. The 1996 Contract specifies that, among other services, Caremark shall:

> Provide a supply of Caremark's Prescription Formulary brochures which list Caremark's preferred brand-name product in each of a number of therapeutic categories and requests the Covered Member to provide the formulary to his or her prescriber to assist the prescriber in making cost-effective prescribing decisions. Caremark shall contact prescribers, as appropriate, to obtain approval for substitution of formulary drugs.

The 1999 Contract again required Caremark to provide a supply of formulary brochures but this time the brochures were to be distributed directly to prescribers. Caremark also agreed to contact prescribers, "as appropriate, to obtain approval for substitution of formulary drugs." The 2003 Contract required Caremark to provide the same formulary services as the 1999 Contract and additionally required Caremark to provide the formulary brochures to the insured union members upon request. The 2003 Contract contained additional provisions in the formulary program section. We have already quoted part of this paragraph in relation to the rebates, and we repeat it here to place it in context:

> [Carpenters] acknowledges that [Carpenters] has the sole discretion and authority to determine the formulary for the Plan. Caremark may hold contracts with the manufacturers of products covered under this Agreement and in connection with such contracts, Caremark may have a financial relationship with such manufacturers and may receive rebates from such manufacturers. In addition, Caremark may contact Covered Members regarding therapeutic compliance,

therapeutic education or similar programs, at no additional expense to [Carpenters]. On an aggregate basis, Caremark's Therapeutic Interchange Program (TIP) shall result in net savings to [Carpenters]. A Covered Member shall not pay a higher Copayment due to Caremark's TIP program. Caremark may receive compensation from pharmaceutical manufacturers for certain of these services.

### 4. Drug Switching Program

As we noted above in the formulary program discussion, each contract obliged Caremark to "contact prescribers, as appropriate, to obtain approval for substitution of formulary drugs." Carpenters refers to this as the "drug switching program." In addition to the sections quoted above, Carpenters relies on another provision in the 1999 Contract under the mail service pharmacy section to demonstrate Caremark's duties under the drug switching program. This provision obliges Caremark, "subject to prescriber approval and applicable law, [to] provide pharmaceutical cost containment services, including generic and therapeutic substitutions." According to Carpenters, under these provisions, Caremark bears the sole responsibility of deciding whether to try to persuade a prescriber to switch a prescription to a different, therapeutically similar drug. Because of the discretion granted to Caremark in determining how to implement this provision, Carpenters contends that Caremark is its fiduciary under ERISA.

### B.

Caremark moved to dismiss the ERISA claim on the ground that the company was not an ERISA fiduciary under any of the three contracts. The district court noted

that, in order to be considered an ERISA fiduciary, Caremark must either (1) exercise discretionary authority or discretionary control respecting the management of the plan; (2) exercise any authority or control respecting management or disposition of its assets; or (3) have any discretionary authority or discretionary responsibility in the administration of the plan. The court stated that Caremark was a fiduciary only to the extent that it exercised discretionary authority and thus it was possible that Caremark could be a fiduciary for some purposes and not for others. The court first held that, because each contract specified that "nothing in this Agreement shall be deemed to confer upon Caremark the status of fiduciary as defined" in ERISA, Caremark was not a fiduciary. The court then explored whether Caremark could nonetheless be a fiduciary for the four purposes alleged by Carpenters: (1) in negotiating with retail pharmacies the prices that the plan pays for drugs; (2) in negotiating with drug manufacturers the prices that the plan pays for drugs and the rebates obtained for those drugs; (3) in determining which drugs will comprise the formulary; and (4) in determining how to administer the drug switching program. The complaint alleged that Caremark breached its fiduciary duties by charging Carpenters a higher price than Caremark negotiated with retail pharmacies, and by choosing drugs for the formulary that were more expensive so that Caremark could pocket extra rebates it obtained from drug makers.

The district court found that nothing in the contracts required Caremark to pass through cost savings to Carpenters. Instead, the court ruled, the retail pharmacy provisions obligated Caremark to charge Carpenters a set price for each drug, a price that could only be changed after further negotiations and agreement. Because the prices set in the contracts were the result of arm's-length negotiations between Carpenters and Caremark, the

court held that Caremark could not be held liable for a breach of fiduciary duty related to retail pharmacy prices. As for Caremark's dealings with drug manufacturers, the district court found that nothing in the contracts required Caremark to enter into agreements with drug manufacturers on behalf of Carpenters or to negotiate with drug makers for the prices Carpenters would pay for drugs. The court again pointed out that the contracts set the prices for drugs based on negotiations between Caremark and Carpenters, an arm's-length deal that did not give rise to fiduciary duties.

Addressing issues related to the formulary and drug switching programs, the court noted that Carpenters adopted Caremark's formulary in each contract. In each contract, a provision detailing Carpenters's duties under the contract expressly stated that Carpenters had the "sole authority to control and administer the Plan." In addition to those general declarations of Carpenters' authority in each contract, the 2003 Contract specified that Carpenters had the "sole discretion and authority to determine the formulary for the Plan." Because of these provisions giving Carpenters the sole authority to control the plan and because of the negotiated drug prices in each contract, the court concluded that Caremark did not breach any fiduciary duties with respect to the formulary program or the drug switching program. Finally, turning to Carpenters' arguments about the rebates, the court noted that each contract specified a set rebate that Caremark was to pay to Carpenters for each prescription filled. Nothing in any of the three contracts required Caremark to pass along to Carpenters any additional rebates issued by the drug manufacturers. Therefore, the court held, the rebate provisions did not create any fiduciary duties for Caremark. Accordingly, the court dismissed Carpenters' claim for breach of fiduciary duty. Carpenters appeals.

**II.**

On appeal, Carpenters argues that Caremark is an ERISA fiduciary because Caremark has discretionary authority (1) to negotiate with retailers the price that Carpenters pays for prescription drugs on behalf of its members and to unilaterally adjust those prices to adapt to market changes; (2) to negotiate with drug manufacturers the prices that Carpenters pays for drugs and to determine the amount of financial incentives from manufacturers that Carpenters would share on its own purchases; (3) to advise Carpenters on the initial content of its formulary and then to unilaterally alter the formulary; and (4) to manage the drug switching program. Carpenters also contends that Caremark's disavowal of its fiduciary status in the contracts is ineffective and void as against public policy pursuant to statute.[3]

The district court dismissed the claim under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim because Caremark could not be an ERISA fiduciary under the facts alleged. On appeal, we accept as true all well-pleaded facts, and drawing all inferences in favor of Carpenters, we review *de novo* whether the complaint states a claim for which relief can be granted. *Baker v. Kingsley*, 387 F.3d 649, 660 (7th Cir. 2004); *Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). To make out a claim for breach of fiduciary duty under ERISA, Carpenters must show that Caremark was a fiduciary as that term is defined in the statute and that Caremark was acting in its capacity as a fiduciary at the time it took the actions that are the subject of the complaint. *See* 29 U.S.C. §§ 1002(21)(A), 1106(b);

---

[3] We need not address this last point because we find that Caremark is not an ERISA fiduciary under any of the contracts.

*Pegram v. Herdrich*, 530 U.S. 211, 223-226 (2000); *Baker*, 387 F.3d at 660. A person is a fiduciary for an ERISA plan "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); *Pegram*, 530 U.S. at 223; *Baker*, 387 F.3d at 660.[4] Caremark may be an ERISA fiduciary for some purposes and not for others. *Baker*, 387 F.3d at 660.

## A.

Carpenters argues first that Caremark has discretionary authority or discretionary control to negotiate up-front and adjust on an ongoing basis the price Carpenters pays for

---

[4] Carpenters alleged that Caremark violated section 1106(b) when it engaged in certain transactions related to the prescription drug benefit program. That section provides that a fiduciary shall not "(1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b). Because we find that Caremark was not a fiduciary when it engaged in any of the relevant transactions, we need not address this section further.

drugs that union members obtain from retail pharmacies. A thorough review of the contract provisions quoted above in section A.1, however, reveals that, in each of the three contracts, Carpenters agreed to pay set prices for the drugs, prices negotiated with Caremark at arm's length. *See Central States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 910 (7th Cir. 2000) (when a contract is unambiguous, the court may declare its meaning as a matter of law). In each contract, that price was tied to a number fixed by neither Carpenters nor Caremark. For example, the price depended sometimes on average wholesale prices ("AWP") as determined by a national index. In some instances, the price was based on a retailer's "usual and customary charge," that is, the retail price charged by a participating pharmacy for the particular drug in a cash transaction on the date the drug was dispensed as reported by the participating pharmacy to Caremark. In the case of generic drugs, the price was often fixed by a schedule used by Medicare and Medicaid to determine how much those programs would pay for participants' prescriptions (the "HCFA MAC"). There was no way for Caremark to "negotiate" the AWP reported on a national index. Nor could Caremark negotiate the usual and customary price that a pharmacy charged other customers in cash transactions. And finally, Caremark was in no position to negotiate the prices the federal government was willing to pay for drugs for Medicare and Medicaid recipients. In each contract, Carpenters agreed to pay prices based on those fixed numbers, sometimes with a percentage discount that Carpenters and Caremark negotiated at arm's length, and in each instance with a fixed dispensing fee attached to each prescription. As the district court noted, nothing in any of the contracts required Caremark to pass through any additional cost savings it managed to negotiate with retailers.

Nor could Caremark increase the prices "unilaterally" due to changes in the marketplace, as Carpenters con-

tends. Although each contract provided that prices could be adjusted "[i]n the event of changes in the marketplace beyond Caremark's control," every contract also required that any changes be made in a writing signed by both parties. The provision thus gave Caremark the right to renegotiate prices during the contract term but not the right to change the prices unilaterally.

That brings us to the somewhat puzzling provision in each contract stating that "Caremark will use its best commercially reasonable efforts to negotiate these rates with existing pharmacies in [Carpenters'] network." The district court did not address what "rates" this provision covered or what this provision meant. Carpenters cites this provision as a source of discretionary authority for Caremark, resulting in fiduciary duties. As we noted above, Caremark could not negotiate AWP, usual and customary charges or HCFA MAC. Carpenters argues that Caremark was to negotiate with the retailers the rates that Caremark would pay on behalf of the plan, costs that were then reimbursed by Carpenters. According to Carpenters, Caremark was to use its best efforts to negotiate the rates that Carpenters was to reimburse Caremark. This argument makes little sense given that Carpenters negotiated to pay Caremark fixed prices for the drugs based on indexes largely outside the control of either party to the contract. The only amounts within the control of Caremark and Carpenters were the percentage discounts and the dispensing fees, numbers that were negotiated between Carpenters and Caremark at arm's length. The contract contained no mechanism for a pass-through of any additional savings Caremark managed to negotiate with retailers. The contracts did not provide, for example, that Carpenters would pay AWP minus the highest percent discount that Caremark could negotiate with retailers using its market power. Without such a provision, Caremark was free to negotiate with retailers to

pay less than the amount Carpenters would later reimburse it, allowing Caremark to pocket the difference. This, of course, is the very conduct that Carpenters alleges was a breach of fiduciary duty. Given that this scheme was the very deal for which Carpenters bargained at arms' length, Caremark owed no fiduciary duty in this regard. *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1131-32 (7th Cir. 1983) (parties bargaining at arm's length prior to entering into contract owe no fiduciary duties for pre-contract activities). *See also Pharmaceutical Care Mgmt. Assoc. v. Rowe*, 429 F.3d 294, 301 (1st Cir. 2005), *cert. denied*, 126 S. Ct. 2360 (2006) (holding that pharmaceutical benefit management companies are generally not ERISA fiduciaries because they lack discretionary authority or control in the management of the plan but rather engage in ministerial duties).

This is not to say that the "commercially reasonable efforts" provisions had no meaning in the contracts. We note first that the provision required Caremark to negotiate "these rates" with "existing pharmacies in [**Carpenters'**] network."[5] In other words, the parties had just agreed on the rates Carpenters would pay for drugs purchased from retailers in **Caremark's** pharmacy network; that is what is meant by "these rates." Caremark was now agreeing to use commercially reasonable efforts to negotiate with pharmacies in **Carpenters'** existing

---

[5] The exact wording of this phrase in the 1996 Contract is "existing pharmacies in the Client's network," where "Client" was defined as Carpenters. The 1999 Contract also referred to Carpenters as the "Client" in this provision. In 2003, the terminology changed to "existing pharmacies in the Participating Group's retail network, where "Participating Group" was defined as Carpenters. Thus, in each instance, Caremark was agreeing to negotiate the rates with **Carpenters'** existing pharmacy network.

network, i.e., the network of retailers that Carpenters used before contracting with Caremark, so that Carpenters could pay these same rates when covered members used retailers in Carpenters' existing network. This is the most straight-forward reading of the provision.

Carpenters argues that the "commercially reasonable efforts" provision applied broadly to require Caremark to negotiate rates with Caremark's **own** retail network. If this is the case, and we think it is not given the express language of the contracts, we must still make sense of what was meant by "these rates." The word "rates" in these provisions must refer to the one number within the control of the parties, the percentage discount number. Reading the contracts this way, Caremark agreed to use commercially reasonable efforts to negotiate discounts with its network of retailers, both at the time it entered into the contracts with Carpenters and later when the marketplace changed. Carpenters apparently believed that the percentage discounts reflected in the contracts were the best rates that Caremark could negotiate with its own retailers using its market power. In other words, Carpenters believed that Caremark was passing along **all** of the savings that Caremark could negotiate with retailers. But nothing in the contracts required Caremark to pass along all of the savings. At most, this language required Caremark to come to its negotiations with Carpenters with the lowest prices it could obtain from retailers using its market power. Caremark was always free to then negotiate a higher price with Carpenters than Caremark paid for the drugs. Except for a modest dispensing fee, that is how Caremark made its money. It was to Carpenters' benefit to deal with Caremark rather than dealing directly with the retailers. Caremark had many clients and could use this volume to negotiate better prices with the retailers than a single client could negotiate. Caremark could then pass some of those savings on to clients like Carpenters and

still make money by keeping the difference for itself. By agreeing to pay a fixed amount to Caremark, Carpenters forwent its opportunity to garner any additional savings that Caremark could extract from retailers.

Each contract also included slight variations of the following: "In the event of changes in the marketplace beyond Caremark's control resulting in a reduction in the number of participating pharmacies or in contract reimbursement rates for this retail network, pricing shall be adjusted to reflect these changes." This provision allowed Caremark to seek a new pricing agreement with Carpenters if market changes increased Caremark's cost of dealing with the retailers. This is another way in which the "commercially reasonable efforts" language possibly came into play. If there were changes in the marketplace that caused retailers to increase charges to Caremark, Caremark agreed to use commercially reasonable efforts to keep those increases as low as possible. The contracts then allowed Caremark to seek additional funds from Carpenters to account for these increased costs from the retailers, again bringing to the table the lowest price point that Caremark could negotiate with retailers. But nothing in any of the contracts obliged Caremark to pass on to Carpenters all of the savings that resulted from its ongoing negotiations with retailers. Instead, the contracts provided that Carpenters and Caremark would adjust the pricing between themselves, another arm's-length transaction.

Under any reading of the contracts, Caremark was not obliged to pass along all of the savings it negotiated with drug retailers. Failure to pass along all of the savings is the core of Carpenters' complaint. Carpenters did not allege that Caremark breached a duty to negotiate rates with Carpenters' existing network or that Caremark failed to come to the bargaining table with the best rates it could negotiate with retailers as the starting point in

the discussion. Although Caremark might have been a fiduciary for some purposes, it was not a fiduciary for the purposes named in this count of Carpenters' complaint. *Plumb v. Fluid Pump Service, Inc.*, 124 F.3d 849, 854 (7th Cir. 1997) (in assessing whether a person can be held liable for a breach of fiduciary duty, a court must ask whether that person is a fiduciary with respect to the particular activity at issue). The district court correctly concluded that Caremark was not a fiduciary for the purpose of negotiating prices with drug retailers.

**B.**

Carpenters next argues that Caremark possessed discretion to negotiate with drug manufacturers (as opposed to retailers) the prices that Carpenters pays for drugs and to determine the amount of financial incentives from manufacturers that Carpenters would share on its own purchases. Because of this discretion and because Caremark controlled Carpenters' portion of the rebates paid by drug manufacturers, Carpenters contends that Caremark is an ERISA fiduciary under 29 U.S.C. § 1002(21)(A). As detailed above, each contract required Caremark to pay to Carpenters rebates in a certain amount for prescriptions filled. The 1996 and 1999 Contracts relieved Caremark of the obligation to pay rebates to Carpenters if Caremark was ineligible to receive rebates from the drug manufacturers' rebate programs. The 1999 and 2003 Contracts acknowledged that Caremark would hold all contracts with the drug manufacturers relating to rebates. The 2003 Contract went one step further and asserted that Caremark "may have a financial relationship" with the manufacturers. Common to all three contracts was the requirement that Caremark pay Carpenters a fixed amount of rebates on certain prescriptions filled. Carpenters complains that Caremark negoti-

ated other types of financial incentives with the manufac-
turers, allowing Caremark to "unilaterally manipulate
the amount of rebates paid to Carpenters . . . or even
avoid paying them altogether."

No provision in any of the contracts requires or autho-
rizes Caremark to enter into agreements *on behalf of
Carpenters* with the drug manufacturers. To the contrary,
each contract required Caremark to hold any rebate
contracts with the drug makers and to pay a fixed rebate
to Carpenters for certain prescriptions filled. There is no
discretion related to this payment. Nor is there any
provision in the contracts requiring Caremark to pass
through to Carpenters 100% of the rebates Caremark
might receive from drug manufacturers. As with the
provisions relating to retail pharmacies, Carpenters
agreed to receive a fixed amount for rebates, allowing
Caremark to retain any rebates above and beyond those
fixed amounts for itself. Caremark was in no position to
unilaterally change the amount of the rebates because the
amount was fixed in the contract. Moreover, the 1996
and 1999 Contracts provided that Caremark would be
relieved of this payment obligation if "for any reason"
Caremark was no longer eligible to participate in the drug
makers' rebate programs. Carpenters' complaint that
Caremark could negotiate other incentive payments and
work to eliminate its own eligibility for rebates (thereby
relieving Caremark of its duty to pay rebates to Carpen-
ters) is a possibility that is contemplated under the
contracts. This was the deal for which Carpenters bar-
gained with Caremark at arms' length and thus Caremark
owed no fiduciary duties to Carpenters related to rebates.[6]

---

[6] We also reject Carpenters' argument that Caremark con-
trolled "plan assets" in the form of "the portion of rebates paid
by drug manufacturers that belongs to Carpenters." Caremark

(continued...)

**C.**

The formulary and drug-switching features of the plan
are closely related and we will address them together. The
formulary was the list of preferred drugs for the plan.
Carpenters adopted Caremark's standard formulary with
each contract, in each instance generally retaining the
"sole authority to control and administer the Plan." In the
2003 Contract, Carpenters specifically acknowledged
that it had the sole discretion and authority to determine
the formulary for the plan. Carpenters alleged in its
complaint that the formulary is not a static list; Caremark
adds and removes drugs from the list as new drugs become
available. Under the drug-switching program, Caremark
was required to contact prescribers "as appropriate" and
obtain approval for substitution of formulary drugs.

The district court noted that, in the 2003 Contract,
Carpenters expressly acknowledged that it had the sole
discretion and authority to determine the formulary for
the plan. Moreover, the court noted, every contract pro-
vided that Carpenters retained the sole authority to
control and administer the plan. As we noted above,
Caremark can be held to be a fiduciary only to the
extent that it possesses or exercises discretionary author-
ity or discretionary responsibility in the administration
of the plan. Given that Carpenters retained **sole** authority
to control and administer the plan, Carpenters was the

---

6 (...continued)
was not collecting rebates from drug makers on behalf of
Carpenters. The contracts clearly specify that Caremark had an
independent contractual duty to pay rebates to Carpenters. *See
supra* Part I.A.2. Caremark was not collecting rebates from drug
makers for Carpenters and then passing through a portion; thus
Caremark was not controlling assets of the plan but rather
was controlling its own assets in making these contractual
rebate payments to Carpenters.

final arbiter of the content of the formulary and any drug-switching decisions. Caremark's decisions relating to the formualry and drug-switching programs were akin to the decisions made by a claims administrator. In *Klosterman v. Western Gen. Mgmt., Inc.*, 32 F.3d 1119 (7th Cir. 1994), a plan participant sued a company hired to administer claims for an ERISA plan. The participant was enrolled in a plan administered by his employer's human resources manager, and the plan retained the authority to make the ultimate decisions in all doubtful or contested claims. Western General was hired to administer claims according to the parameters of the plan. 32 F.3d at 1124. We found that Western General was not acting as a fiduciary in making claims decisions because it did not have the authority to make a final decision. 32 F.3d at 1124. We noted that Western General did not become an ERISA fiduciary simply by performing administrative functions and claims processing within a framework of rules established by the plan especially when the ultimate decision belonged to the plan. 32 F.3d at 1124-25. Similarly, Carpenters selected the features of the plan and charged Caremark with the ongoing administration of the formulary and drug-switching programs. But Carpenters retained final authority over the content of the formulary and the administration of the drug-switching programs. Caremark lacked the ultimate discretionary authority to administer these programs and thus was not a fiduciary for these purposes.

Carpenters seeks to minimize the import of the provisions retaining sole authority for itself by contending that Caremark exerted considerable influence over the initial formulary selection and "complete control" over the ongoing content of the formulary and the drug-switching program. The express language of the contracts contradicts this characterization of Caremark's authority over these programs. Carpenters adopted Caremark's pre-

existing formulary as a feature of its plan. Under *Pegram*, the formulary program and drug-switching program were plan features not subject to fiduciary standards. *Pegram*, 530 U.S. at 226-27. Caremark was not a fiduciary at the time it was engaged in arm's-length negotiations with Carpenters, prior to entering into any of the agreements. There is no fiduciary liability for acts that precede fiduciary status. *Pegram*, 530 U.S. at 227. *See also Associates In Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569-70 (7th Cir. 1991) (providers of professional services who are advising plans are generally not ERISA fiduciaries unless their services give them decision-making authority over the plan or plan assets). As for any ongoing changes to the formulary or specific decisions by Caremark in administering the drug-switching program, Carpenters retained for itself the final authority to administer these programs on an ongoing basis. Under *Klosterman*, Caremark was thus not a fiduciary for this purpose. *Klosterman*, 32 F.3d at 1124-25.

### III.

For the reasons stated above, Caremark was not acting as a fiduciary in any of the relevant actions detailed in the complaint. Accordingly, Carpenters may not sustain a claim against Caremark for breach of fiduciary duty under ERISA.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*