In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-2702

JAMES D. MINCH and RICHARD A. GRAF,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 2586—**Samuel Der-Yeghiayan**, *Judge.*

---

ARGUED SEPTEMBER 14, 2006—DECIDED MAY 14, 2007

---

Before CUDAHY, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* More than two years after the City of Chicago (the "City" or "Chicago") agreed to discipline and discharge its firefighters solely for cause, the City adopted a Mandatory Retirement Ordinance ("MRO") compelling firefighters to retire at age 63. Two of the firefighters who were forced to retire under the MRO filed suit on behalf of themselves and others similarly situated, contending that mandatory retirement amounted to age discrimination prohibited by the Age Discrimination in Employment Act ("ADEA") as well as a deprivation of procedural due process. We concluded in *Minch v. City of Chicago*, 363 F.3d 615 (7th Cir. 2004), that mandatory

retirement of firefighters was not contrary to the ADEA. Today we conclude that mandatory retirement did not deprive the plaintiffs of their due process rights, because the collective bargaining agreement did not preclude the City from compelling its firefighters to retire at a particular age.

## I.

On January 14, 1998, the City and its firefighters entered into a collective bargaining agreement effective for the four-year term beginning July 1, 1995 and ending on June 30, 1999. More than five years later, on July 9, 2003, the parties entered into a successive agreement governing the period from July 1, 1999 through June 30, 2007. In each instance, following the execution of the agreement, the Chicago City Council enacted the agreement into law. In all material respects, these two agreements were identical, and for ease of discussion we shall henceforth treat them as a single agreement (the "CBA" or the "agreement"). We set forth the relevant terms of the agreement below.

## ARTICLE IX

## SENIORITY RIGHTS

**Section 9.1** Seniority

A. Seniority is defined as an employee's length of continuous service since his last date of hire. . . .

. . .

C. An employee's continuous service and the employment relationship shall be terminated when an employee:

1.  Resigns or quits . . . [;]

2.  Is discharged for just cause;

3.  Retires or is retired;

4.  Is absent for three (3) consecutive days (work-days) without notifying the Employer's autho-rized representative;

5.  Is laid off and fails to report for work within ten (10) calendar days after mailing . . . a notification of recall . . .;

6.  Does not report to work after the termination of an authorized leave of absence, . . . .

## ARTICLE XIII

## NO DISCRIMINATION

**Section 13.1**   No Discrimination

. . . In accordance with applicable law, neither the Employer nor the Union shall discriminate against any employee covered by this Agreement because of race, creed, color, national origin, sex, age, religion or political affiliation.

. . .

## ARTICLE XVI

## GENERAL PROVISIONS

. . .

**Section 16.2**   Discipline and Discharge

. . .

B.  The Employer agrees that employees shall be disciplined and discharged only for just cause. . . .

. . .

**ARTICLE XIX**

**GUARANTEE OF TERMS**

The Employer agrees that this Agreement shall be immediately submitted to the City Council of the City of Chicago for ratification and concurrent adoption in ordinance form pursuant to the City's Home Rule authority. Such action by the Council shall commit the City of Chicago to enact no subsequent ordinances, executive orders or rules and regulations having the force and effect of law which would impair the binding effect of or make unenforceable the terms of this Agreement.

R. 112 Ex. A.

In the years preceding the parties' negotiation and adoption of the Agreement, federal age discrimination law had been in a state of flux with respect to age limits on public safety personnel. A more complete history is set forth in our opinion in *Kopec v. City of Elmhurst*, 193 F.3d 894, 896-98 (7th Cir. 1999). Briefly, when Congress extended the ADEA to state and local governments in 1974, no exception was made for individuals employed as police officers and firefighters; consequently, age limits were permitted only to the extent that employers could establish that age was a bona fide occupational qualification for the job. *See id.* at 896. For a time, doubts remained as to whether the Tenth Amendment permitted Congress to subject state and local employees to federal anti-discrimination law. *See id.* at 896-97. Those doubts were put to rest by the Supreme Court's decision in *E.E.O.C. v. Wyoming*, 460 U.S. 226, 103 S. Ct. 1054 (1983). In 1986, however, Congress amended the ADEA to exempt from the statutory ban on age discrimination any state or local age limits on public safety personnel which were in place as of March 3, 1983, the day after the *Wyoming* case was decided. *Id.* at 897. That exception expired by its

terms on December 31, 1993, with the result that age limits for such personnel were once again presumptively invalid under the ADEA. *Id.* Then, in 1996, Congress reinstated the exemption retroactive to December 31, 1993 and with no expiration date. *Id.* at 898.

Seventy years ago, Chicago for the first time enacted an ordinance requiring those of its police and fire personnel holding civil service positions to retire at the age of 63. *See Malloy v. City of Chicago*, 15 N.E.2d 861, 863 (Ill. 1938) (per curiam). After the ADEA was extended to state and local governments, and once the Supreme Court in *E.E.O.C. v. Wyoming* sustained that extension, Chicago raised the mandatory retirement age for its police officers and firefighters to 70, beyond which age the ADEA did not apply at that time. *See Minch I*, 363 F.3d at 618. After the 1986 exemption was adopted, Chicago in 1988 reinstated a mandatory retirement age of 63 for these personnel. *Id.* at 619. Following the expiration of the statutory exemption in 1993, the City again lifted the age cap in order to comply with the ADEA. *Id.* When the City and the firefighters' union came to terms on the CBA in 1998, the City had not yet restored a mandatory retirement age for its police and fire personnel, although Congress had again authorized such age caps in 1996. Not until May 2000 did the City finally take advantage of the exemption to put the mandatory retirement age of 63 back into place. *Id.* at 620; *see* Chicago, Ill. Municipal Code § 2-152-410.

On December 31, 2000, the effective date of the reinstated age limit, the two named plaintiffs in this action, James D. Minch and Richard A. Graf, were required to retire from the Chicago Fire Department against their wishes. Minch was 64 at that time; Graf was 63.

Minch and Graf[1] then filed suit against the City on behalf of a class of similarly situated firefighters contending, among other things, that enforcement of the City's MRO violated the ADEA and deprived them of their Fourteenth Amendment right to due process.[2] After the district court (Hon. Elaine E. Bucklo) denied the City's motion to dismiss these claims, *Drnek v. City of Chicago*, 192 F. Supp. 2d 835 (N.D. Ill. 2002) ("*Drnek I*"), the court

---

[1] Mandatorily-retired police officer Richard Cosentino joined this suit on behalf of himself and similarly-situated police officers. Separately, another police officer, Donald Drnek, filed an individual action challenging the age limit, and the instant suit was consolidated with Drnek's action. Although the police officers also challenged the mandatory retirement age on due process grounds, the collective bargaining agreement that the City entered into with its police officers contained a provision expressly recognizing that nothing in that agreement precluded the City from requiring police officers to retire on or after the age of 63. R. 7 Mem. Ex. B § 10.2. In light of that provision, the district court concluded at the outset of the litigation that the police officers had no protected property interest in employment beyond the age of 63 and dismissed their due process claims. *Drnek v. City of Chicago*, 192 F. Supp. 2d 835, 848-49 (N.D. Ill. 2002). Consequently, once this court ordered the dismissal of the age discrimination claims in *Minch I*, the police officers had no remaining claims. The police officers have not challenged the dismissal of their due process claims and are not parties to this appeal.

[2] The plaintiffs asserted a companion claim for the alleged violation of their right to due process under the Illinois constitution. The court ultimately disposed of that claim on the same basis as the federal due process claim. R. 120; *Minch v. City of Chicago*, 2005 WL 78945 (N.D. Ill. Jan. 12, 2005). However, Minch and Graf do not challenge the dismissal of the state claim, and consequently we make no further mention of that claim here.

certified for interlocutory appeal the question of whether a state or local ordinance compelling the retirement of public safety personnel at a particular age which otherwise meets the criteria of the statutory exemption set forth in 29 U.S. § 623(j)(1) could be proven to constitute a subterfuge to evade the purposes of the ADEA and thus be actionable under section 623(j)(2), *Drnek v. City of Chicago*, 205 F. Supp. 2d 894 (N.D. Ill. 2002) ("*Drnek II*"). We concluded in *Minch I* that the answer to that question was yes, but that the facts alleged in this case did not support a viable subterfuge claim. 363 F.3d at 628-30. When the City reinstated a mandatory retirement age for its firefighters, we reasoned, it took action that was expressly authorized by the ADEA. Even if, as the plaintiffs alleged, City officials adopted the MRO based on outdated, inaccurate, and biased assumptions about the abilities of older workers, their motives were not sufficient to establish an actionable subterfuge, given the express Congressional authority they had been given to impose age limits on the employment of public safety personnel. *Id.* at 628-29. Rather, to establish subterfuge, the plaintiffs would have to show that the City enacted and enforced the MRO as a means of evading a separate, substantive provision of the ADEA. *See id.* at 630 (discussing hypothetical scenarios that might show subterfuge). This was a showing that the plaintiffs, on the facts alleged in this case, were unable to make. *Id.* Accordingly, we remanded the case to the district court with directions to dismiss Minch and Graf's ADEA claim and to conduct further proceedings consistent with this court's opinion. *Id.* at 631.

With the ADEA claim out of the case, what remained was the plaintiffs' Fourteenth Amendment due process claim. The due process claim is premised on the notion that the terms of the CBA, to which the City had contrac-

tually and legislatively bound itself, precluded the City from summarily forcing any firefighter to retire based solely on his or her age and gave the firefighters a protected property interest in continued employment absent good cause to discharge them. Section 16.2(B) of the CBA reflected the City's agreement "that employees shall be disciplined and discharged *only* for just cause." (Emphasis ours.) In the plaintiffs' view, involuntary retirement amounts to a discharge, and as such was an action the City could only take with just cause—age alone would not suffice. The plaintiffs also construe two additional provisions of the CBA to have precluded the City from adopting the MRO: Section 13.1, which prohibited the City and the firefighters' union alike from discriminating against any employee based on age, "[i]n accordance with applicable law," and Article XIX, which provided that once the CBA was ratified and enacted into law, the City would enact no further legislation nor adopt any rule "which would impair the binding effect of or make unenforceable the terms of this Agreement."

While the case was pending on interlocutory appeal, it had been reassigned to a new district judge (Hon. Samuel Der-Yeghiayan). On review of this court's decision in *Minch I*, the court invited the City to re-file its motion to dismiss the due process claim. Judge Der-Yeghiayan believed that Judge Bucklo's rationale for refusing to dismiss that claim overlapped with her reasons for not dismissing the ADEA claim; given this court's decision that the ADEA claim was not viable, Judge Der-Yeghiayan believed that a fresh examination of the due process claim was in order. R. 146 at 3; *see also* R. 133 at 4. The City accepted the district court's invitation and renewed its motion to dismiss this claim.

After entertaining the parties' memoranda, the district court dismissed the due process claim. R. 120; *Minch v.*

*City of Chicago*, 2005 WL 78945 (N.D. Ill. Jan. 12, 2005). The court rejected the plaintiffs' contention that CBA section 16.2(B)'s language requiring just cause for a discharge precluded involuntary retirement. "[S]uch a provision clearly was in regards to disciplinary action taken against employees and it is not applicable in the instant action because none of the Plaintiffs claim that they were forced into mandatory retirement as a part of a disciplinary measure for misconduct." *Id.* at *2. The court also understood section 9.1(C)(3) of the Agreement, which referred to an employee who "retires or is retired," as permitting involuntary retirement without just cause. *Id.* Finally, the court found that the MRO was not contrary to the CBA's anti-discrimination provision. Section 13.1 prohibited only unlawful age discrimination, the court reasoned, and this court in *Minch I* had held that imposing age limits on the employment of public safety personnel was not unlawful. *Id.* The district court subsequently denied the plaintiffs' motion to reconsider. R. 133.

## II.

The district court disposed of the due process claim pursuant to Federal Rule of Civil Procedure 12(b)(6). A court may properly dismiss a claim pursuant to Rule 12(b)(6) only if the plaintiff could prove no set of facts consistent with allegations of the complaint on which relief could be granted. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957); *see also*, *e.g.*, *Christensen v. County of Boone, Ill.*, — F.3d —, 2007 WL 841097, at *2 (7th Cir. Mar. 21, 2007) (per curiam). Our review of the district court's decision to dismiss is, of course, de novo. *E.g.*, *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 471 (7th Cir. 2007). As always, we are obliged to accept the plaintiffs' factual

allegations as true and construe those allegations in the light most favorable to the plaintiffs. *Id.*[3]

At the outset, we may put aside any concern as to whether the district court failed to pay adequate heed to the law of the case doctrine. Among other things, the law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination. *See*, *e.g.*,

---

[3] We note that although the CBA was not attached to, and therefore not made part of, the plaintiffs' complaint, the plaintiffs do not contest the district court's authority (or our own) to consider the CBA in evaluating the viability of their due process claim. We have recognized that when a complaint refers to and rests on a contract or other document that is not attached to the complaint, a court might be within its rights to consider that document in ruling on a Rule 12(b)(6) motion to dismiss the complaint without converting the motion into one for summary judgment, so long as the authenticity of the document is unquestioned. *Tierney v. Vahle*, 304 F.3d 734, 738-39 (7th Cir. 2002). As it happens, the complaint in this case neither quoted from nor referred to the collective bargaining agreement; no mention of the CBA was made at all. Yet, there is no question that the plaintiffs' due process claim rests on the terms of the CBA. Indeed, both sides have cited and relied upon the CBA throughout this litigation. Moreover, as we have mentioned, the Chicago City Council did formally adopt the CBA and enact it into law, confirmation of which the City's lawyers tendered to the district court at Judge Bucklo's request. R. 30, 31. As Judge Bucklo recognized, courts may take judicial notice of local ordinances without resorting to summary judgment procedures. *Drnek I*, 192 F. Supp. 2d at 847 (citing *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998), and *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977)). In the absence of any objection to consideration of the CBA, we too shall consider the relevant terms of the agreement in evaluating whether Minch and Graf have a viable due process claim.

*Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 572 (7th Cir. 2006); *Starcon Int'l, Inc. v. N.L.R.B.*, 450 F.3d 276, 278 (7th Cir. 2006); *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997). This presumption against re-opening matters already decided reflects interests in consistency, finality, and the conservation of judicial resources, among others. *Analytical Eng'g, Inc. v. Baldwin Filters, Inc.*, 425 F.3d 443, 454 (7th Cir. 2005). The presumption holds when a case is reassigned from one judge to another. *E.g.*, *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). "In situations where a different member of the same court re-examines a prior ruling, 'the law of the case doctrine . . . reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one.'" *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005) (quoting *Best*, 107 F.3d at 546). When Judge Bucklo denied the City's original motion to dismiss the complaint, she concluded based on the language of the CBA that the plaintiffs had a viable due process claim. Judge Der-Yeghiayan subsequently invoked our decision in the interlocutory appeal as the justification for re-examining the due process claim. Yet, as the plaintiffs point out, our opinion in *Minch I* addressed the ADEA claim alone and had nothing to say on the subject of the due process claim, which was beyond the scope of the interlocutory appeal. It is true that a discrete portion of Judge Bucklo's decision not to dismiss the due process claim had rested upon her assessment of the ADEA claim. Specifically, she had observed that to the extent enforcement of the City's MRO was inconsistent with the ADEA, the CBA's prohibition of age discrimination (section 13.1) would likewise prohibit the City from enforcing the MRO. *Drnek I*, 192 F. Supp. 2d at 848. To that extent, our holding in *Minch I* undercut her rationale. But Judge Bucklo articulated other reasons for sustaining the viability of the due

process claim that were entirely independent of the ADEA claim. *Id.* at 847-48. Our decision in *Minch I* did not implicate those additional grounds and thus did not necessitate a wholesale re-examination of the due process claim.

Nonetheless, Judge Der-Yeghiayan did re-assess the due process claim and find it wanting, precipitating this second appeal. The law of the case doctrine did not necessarily preclude him from doing so to the extent he was convinced the earlier ruling was obviously wrong. *See*, *e.g.*, *Brengettcy*, 423 F.3d at 680; *Mendenhall*, 419 F.3d at 691. However, that was not argued to Judge Der-Yeghiayan and he did not articulate any such concern when he invited the City to re-file its motion to dismiss. To that extent, he acted inconsistently with the law of the case doctrine. Nonetheless, our task at this juncture is to examine the claim and determine for ourselves whether it is viable. The plaintiffs' reasonable expectations that the change in judge would not lead to a change in the law of the case may have been dashed, but the law of the case doctrine does not constrain our review, *Santamarina*, 466 F.3d at 572, and it would not serve the ends of justice for us to mechanistically re-instate the original ruling below simply because the new judge failed to honor the law of the case doctrine, *see Native American Arts, Inc. v. Waldron Corp.*, 399 F.3d 871, 873 (7th Cir. 2005); *McMasters v. United States*, 260 F.3d 814, 818 (7th Cir. 2001); *Best*, 107 F.3d at 547. The appropriate course, particularly given our de novo review, is to decide on the merits whether the complaint states a due process claim on which relief can be granted. *See McMasters*, 260 F.3d at 818; *Best*, 107 F.3d at 546-47. Indeed, that is the thrust of the plaintiffs' opening brief, which criticizes Judge Der-Yeghiayan's decision to re-evaluate the due process claim but does not invoke the law of the case

doctrine or invite us to reverse on that basis.[4] On to the merits.

An essential component of a procedural due process claim is a protected property or liberty interest. *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756, 125 S. Ct. 2796, 2803 (2005); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-77, 92 S. Ct. 2701, 2708-09 (1972). The plaintiffs contend that the CBA's identification of just cause as the sole basis for discipline or discharge gave them a property interest in continued employment of which the City deprived them when it compelled them to retire at age 63. *See id.* at 578, 92 S. Ct. at 2709 (terms of public worker's employment contract can give rise to protected property interest); *Roman v. United States Postal Serv.*, 821 F.2d 382, 386 (7th Cir. 1987) (collective bargaining agreement with public employee can give rise to protected property interest); *Ratliff v. City of Milwaukee*, 795 F.2d 612, 624 (7th Cir. 1986) (same); *cf. Krieg v. Seybold*, 481 F.3d 512, 520 (7th Cir. 2007) (without clause providing that public employee could only be discharged for just cause, at-will employee had no protected property interest in continued employment). Whether indeed the plaintiffs had a protected interest in working beyond the age of 63 is a question that, as both sides agree, turns on the language of the CBA. *See id.* at 519-20; *see generally Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Karr Bro's, Inc.*, 755 F.2d 1285, 1290-91 (7th Cir. 1985) (assessment of what the parties to collective bargaining agreement meant begins with the language of the agreement) (quoting *U.A.W. v. Yard-Man, Inc.*, 716 F.2d

---

[4] We invited supplemental briefing on the law of the case doctrine after the subject was broached by the court at oral argument.

1476, 1479 (6th Cir. 1983)). We must read the agreement as whole, *I.B.E.W., Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 406 (7th Cir. 2002), construing its individual provisions not in isolation but with reference to the rest of the CBA, *Chicago Dist. Council of Carpenters Pension Fund v. K & I Constr., Inc.*, 270 F.3d 1060, 1069 (7th Cir. 2001).

The essential question before us is whether the terms of the CBA are properly understood to bar mandatory retirement. The CBA certainly lacks any provision that expressly authorizes the City to adopt a mandatory retirement age. (By contrast, the agreement that the City entered into with its police officers reserved to the City the authority to impose a mandatory retirement age.) But the omission of such a term is not dispositive. The relevant inquiry is whether the provisions that the parties did include in their agreement preclude the City from imposing a mandatory retirement age on its firefighters. If so, they may have had a protected property interest in continued employment beyond the age of 63.

The CBA term on which the plaintiffs place most emphasis is section 16.2(B), which reflects the City's agreement to discipline and discharge an employee solely for just cause. The City concedes that this provision precludes it from taking disciplinary action against an employee, up to and including firing the employee, without just cause for that action. City's Brief at 26-27. In the plaintiffs' view, mandatory retirement is a form of discharge and as such is not permitted under section 16.2(B) absent just cause—which presumably an employee's age alone would not supply. ("Just cause" is not defined in the agreement, but the parties appear to agree that an employee's age alone would not constitute just cause to discharge him.)

But is involuntary retirement a discharge for purposes of section 16.2(B)? The answer is not obviously yes.

Compelled retirement, like a discharge, severs the employ-ment relationship between employer and employee. Nonetheless, there are intuitive distinctions between being fired and being forced to retire. Retirement is necessarily linked to the employee's age and/or tenure with the employer; and whether voluntary or not, retire-ment often bestows certain benefits on the employee (e.g., a pension and/or continued receipt of insurance and other employee benefits) that he would not enjoy if simply fired. (There is the same intuitive distinction between quitting and retiring voluntarily). Being fired and being forced to retire indubitably have in common the fact that the employer unilaterally terminates the employment relation-ship. But only a broad understanding of the term "dis-charge" that brings within its reach any and all forms of involuntary termination would demand just cause even for an unwilling retirement.

It is in this regard that section 9.1(C) of the Agreement is relevant. For purposes of assessing an employee's seniority rights, section 9.1(C) identifies a variety of ways, both voluntary and involuntary, in which a firefighter's employment relationship with the City may terminate. Discharge for cause is among the identified forms of severance, § 9.1(C)(2), but is by no means the exclusive means of involuntary termination listed. For example, the agreement recognizes that the employment relationship terminates when an employee "retires or is retired." § 9.1(C)(3). Judge Der-Yeghiayan thought that the "is retired" language was an explicit reference to (and authori-zation of) involuntary retirement. It plausibly could be so understood, although this reads much into the use of the passive voice and, in the absence of any other contractual reference to mandatory retirement, may place more weight on the phrase than its two words ought to bear. But even if we place the "retires or is retired" language in the category of voluntary terminations along with "[r]esigns or

quits," *see* § 9.1(C)(1), there remain several other forms of involuntary termination that section 9.1(C) recognizes as distinct from a discharge for cause. These include: being absent from work for three consecutive days without notifying the employer's representative, being laid off and then failing to report back to work within ten days of being recalled, and failing to report back to work on the conclusion of an authorized leave of absence. § 9.1(C)(4)-(6). This makes clear that the term "discharge" in section 16.2(B) does not include all forms of involuntary termination, such that just cause invariably is required whenever the City terminates a firefighter's employment unilaterally. We note that a neutral arbitrator came to the same conclusion in resolving a dispute between a terminated firefighter and the City. R. 114 Ex. A (*Chicago Firefighters' Union, Local No. 2 v. City of Chicago*, Griev. No. 990133, Decision & Award at 22-23 (Mar. 7, 2000) (Peter R. Meyers, Arb.)).

The plaintiffs retort that section 9.1(C) is a seniority provision that in substance deals only with the question of *when* the employment relationship terminates rather than *how* (or, put another way, for what reason) it may be terminated by the City. We have not overlooked the context of the provision. But even having in mind that its focus is the termination of employment for seniority purposes, this section nonetheless is relevant for the light it shines on the scope of the term "discharge." In recognizing multiple forms of involuntary termination apart from a discharge, this provision puts to rest the notion that any termination against the employee's wishes is necessarily a "discharge" for which the City must have just cause. Given the distinctions between retirement and discharge, we do not read section 16.2(B) to condition involuntary retirement on a showing of just cause.

The plaintiffs alternatively rely on the CBA's Guarantee of Terms as a bar to the City's enactment of the MRO.

Article XIX provides that once the Chicago City Council has ratified the CBA and enacted it into local law, the City shall "enact no subsequent ordinances, executive orders or rules and regulations having the force and effect of law which would impair the binding effect of or make unenforceable the terms of this Agreement." We assume for the sake of argument that Article XIX would preclude the City from adopting a mandatory retirement age if, as the plaintiffs have argued, Section 16.2(B) conditioned all forms of involuntary termination, including involuntary retirement, on the existence of just cause. So understood, the CBA would give a firefighter the right to continue working regardless of his age, so long as he could perform the duties of his job and gave his employer no cause to discharge him. And by forcing employees to retire at age 63, the subsequent adoption of the MRO could be thought to impair the binding effect of section 16.2(B) and/or to render it unenforceable.

But because section 16.2(B) does not foreclose the City from imposing a mandatory retirement age, Article XIX poses no independent obstacle to the MRO. Assuredly, the MRO imposed a new condition on the employment of firefighters to which the firefighters' union had not agreed. Unilateral though it was, however, the enactment and enforcement of the MRO neither impaired the binding effect of the CBA nor rendered unenforceable its terms, none of which precluded the adoption of a mandatory retirement age.

Nor do we construe Section 13.1's non-discrimination provision to bar the MRO. This provision of the CBA forbids age discrimination "[i]n accordance with applicable law," which we understand to define the scope of prohibited discrimination as discrimination which is prohibited by federal, state, or local anti-discrimination law. The Chicago Human Rights Ordinance prohibits age discrimination in employment without an explicit exception, akin

to that in the ADEA, for age limits on public safety personnel. Chicago, Ill. Municipal Code § 2-160-030. The plaintiffs thus contend that enforcement of the MRO amounts to a violation of the Human Rights Ordinance.

Yet the same legislative body that enacted the Human Rights Ordinance also enacted the MRO, and in so doing explicitly mandated the age-based retirement of firefighters. The Chicago Commission on Human Relations, in response to discrimination complaints filed by Minch and Graf, concluded that the MRO was reasonably understood as an implicit exception to the Human Rights Ordinance's ban on age discrimination. *In re Minch, et al.*, Case Nos. 01-E-21/44/48, 2001 WL 1042282 (Chi. Com. Hum. Rel. Aug. 24, 2001). Consequently, the ordinance, as construed by the Commission, does not forbid enforcement of the MRO. The plaintiffs have given us no reason to overlook or reject the Commission's construction of local anti-discrimination law.

### III.

The collective bargaining agreement between the City and its firefighters did not preclude the City from subsequently adopting a mandatory retirement age. Because the CBA did not give the plaintiffs a protected property interest in continued employment regardless of their age, the plaintiffs cannot show that they were deprived of procedural due process when the City adopted the MRO and enforced it by compelling their retirement at age 63. Accordingly, the district court properly dismissed the due process claim. We need not reach any of the other arguments the parties have raised.

AFFIRMED

No. 05-2702                                                    19

A true Copy:

Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*