# United States Court of Appeals
## For the First Circuit

Nos. 17-2162
     17-2170

DIPING Y. ANDERSON,

Plaintiff, Appellant/Cross-Appellee,

v.

MEGAN J. BRENNAN, Postmaster General,

Defendant, Appellee/Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch and Lipez, Circuit Judges,
and Katzmann, Judge.[*]

Emily Smith-Lee, with whom Smith Lee Nebenzahl LLP was on brief, for Diping Anderson.
Jennifer Utrecht, Appellate Staff, Civil Division, with whom Chad A. Readler, Acting Assistant Attorney General, Andrew E. Lelling, United States Attorney, Jason C. Weida, Assistant United States Attorney, and Marleigh D. Dover and Andrew Rhorbach, Appellate Staff, Civil Division, were on brief, for Megan Brennan.

---

[*]    Of the United States Court of International Trade, sitting by designation.

December 14, 2018

**LYNCH**, **Circuit Judge**.  In the end in these cross-appeals after a bench trial, we leave the parties just where they were, as we see no error by the trial court.

Plaintiff Diping Anderson was a Postal Police Officer (PPO) employed by the U.S. Postal Service and terminated on September 9, 2013.  Her Title VII lawsuit alleged that her termination as a PPO was unlawfully discriminatory on the basis of race and national origin, and independently was in retaliation for her having filed earlier Equal Employment Opportunity (EEO) complaints.

After a seven-day bench trial, the district court concluded that Anderson was not discriminated against but that the decision to terminate her employment, rather than impose lesser discipline, was in retaliation for her protected conduct -- the assertion of her EEO rights.  The Postal Service appeals that ruling here and Anderson appeals from the remedy awarded -- back pay, but not reinstatement or front pay.  We affirm the district court's rulings.

I.

We take the facts as found by the district court, consistent with record support.  Nevor v. Moneypenny Holdings, LLC, 842 F.3d 113, 116 (1st Cir. 2016).

A.   Background

Diping Anderson was raised in Shanghai, China.   She immigrated to the United States in 1990 and became a U.S. citizen in 1993.   She began work for the Postal Service in 1995, first as a letter carrier, then as a window clerk.   In 2000, she became a PPO.   In her first sixteen years of employment with the Postal Service, from 1995 to 2011, Anderson was never disciplined.

In 2011, Anderson took time off for a workplace ankle injury.   She reported back to work on May 1, 2011, with a doctor's note approving her return.   Her supervisor, Captain Gerald Harrington, refused to allow Anderson to return to work, for a reason not specified in the record.   On May 12, 2011, Anderson filed a request for EEO pre-complaint counseling, alleging race discrimination by Captain Harrington.   Anderson returned to work later, at a time not specified in the record.

On May 23, 2011, an EEO dispute resolution specialist emailed Captain Harrington and then-Sergeant Peter Ford to inform them of Anderson's EEO filing.   The specialist asked to schedule a redress conference.

On May 21, 2011, Anderson had been assigned to check the identification of people entering the employee entrance of the Boston General Mail Facility.   Anderson got a call informing her that her mother had been admitted to a hospital, so she left in the middle of her shift.   She did not get prior approval for this

- 4 -

departure, but she filled out an emergency leave request form and left it on the duty sergeant's desk.  Then-Sergeant Ford approved this emergency leave request on May 24, 2011.

Anderson reported to work the next day, May 25, 2011, to find a broken and unstable stool in place of her normal chair, and attempted to borrow a different chair from a nearby office.  Then-Sergeant Ford told her, "No.  This chair is not authorized."

Anderson brought the matter to Captain Harrington.  She told Harrington that she could not complete her job assignment without a standard-size chair because of her ankle injury.  She added, "I cannot get on the [stool].  Even if I get on, I have a hard time getting off."  Harrington responded, "If you don't like it, go home."  There is no evidence that he had treated others similarly.  Anderson said that she would leave, that she wanted to be put back on workers' compensation status, and that she would come back to work when the broken stool was replaced.  Anderson did not hear back from Captain Harrington.

Anderson did not report to work on May 26, 2011.  Then-Sergeant Ford called to ask why she was absent.  Anderson said that Captain Harrington had told her to go home.  Ford told Anderson that he would consider her to be on sick leave.

Later that day, Ford changed the status of Anderson's May 21 leave request (from when Anderson's mother was in the hospital) from approved to "AWOL" (Away Without Leave).  A note on

the leave request form said that Anderson's leave status was "[c]hanged to AWOL per Capt. H[arrington]." The Postal Service offered no evidence which explained Captain Harrington's decision to reverse Ford's prior approval of Anderson's leave.

On June 15, 2011, Anderson attended an EEO redress conference with Captain Harrington, then-Sergeant Ford, and an EEO mediator, in response to Anderson's May 12 EEO request for pre-complaint counseling. Anderson testified that Captain Harrington and then-Sergeant Ford refused to discuss her allegations of discrimination and told her to file a formal EEO complaint.

On June 24, 2011, then-Sergeant Ford issued Anderson a seven-day suspension for having left her assigned post on May 21, 25, and 26, 2011 (when no stool was provided), before being properly relieved or dismissed. This was the first discipline Anderson received as a Postal Service employee.

Around this same time, a different PPO, Martha Barris, had several conversations with Captain Harrington in which Harrington said that he found Anderson's EEO complaints "distasteful" and that he did not understand why Anderson was filing them.

Anderson later filed a complaint with the EEOC about the seven-day suspension, asserting that the suspension was racially discriminatory. An EEOC Administrative Judge dismissed Anderson's complaint in September 2012 because Anderson had failed to identify

- 6 -

any similarly situated comparator outside her protected group who was treated more favorably.  The Postal Service issued a Notice of Final Action in December 2012 adopting the Administrative Judge's decision.  Anderson did not appeal this decision.

In early 2012, Anderson filed several requests for pre-complaint EEO counseling, alleging incidents of race discrimination and retaliation that had taken place on several dates from December 2011 to February 2012.  The forms listed Captain Ford as a responsible official, and then-Sergeant Joseph Motrucinski was also listed on the last of the request forms.

On March 29, 2012, Anderson filed a formal EEO complaint alleging race discrimination and retaliation by Captain Ford.[1]  Anderson voluntarily withdrew the complaint in its entirety in October 2012.  The record does not reveal the reason for this withdrawal.

Later in 2012, Anderson received two Letters of Warning.  The first stated it came from Anderson's failure to carry her firearm during the performance of her official duties.  Anderson did not file an EEO complaint in response to that first Letter.

---

[1]    Anderson entered into the district court record a version of that EEO complaint that also listed then-Sergeant Motrucinski as a responsible official.  The Postal Service's version listed only Ford.  Anderson admitted that she added Motrucinski's name sometime later.  The district court found that Anderson had made this alteration to bolster her retaliation claims against Motrucinski, and that this detracted from her credibility.

The second Letter, issued on August 29, 2012, stated it came from Anderson's failure to properly protect and secure her weapon. On September 11, 2012, Anderson filed another request for EEO pre-complaint counseling, asserting that the second Letter of Warning represented unlawful retaliation for her prior EEO activity. Anderson named Captain Ford and then-Sergeant Motrucinski as responsible officials.

About two weeks later, on September 26, 2012, Anderson received a fourteen-day suspension.[2] There were two bases stated for this discipline. The first went back to July 2012, when then-Sergeant Motrucinski told Anderson that she should not store her weapon locker key inside the weapon locker itself, because doing so was potentially dangerous (an unauthorized person might gain access to the firearms). Anderson stopped storing her key in this way. Even so, Sergeant Gregg McGee told then-Sergeant Motrucinski that, on four separate occasions after, he found Anderson's weapon locker key stored in her weapon locker. McGee, however, admitted that he did not confront Anderson on any of those four occasions, that he did not tell any of her supervisors, and that he took no pictures of the alleged infractions, as was his normal practice.

---

[2] To be more precise, Anderson received a Letter of Warning in Lieu of a Fourteen-Day Suspension. This Letter carries the same weight as a fourteen-day suspension, but does not require the PPO to take time off work. The district court referred to this discipline as a "fourteen-day suspension." For the sake of clarity, we do too.

The district court found McGee's testimony "unlikely."[3]  Anderson v. Brennan, No. CV 14-13380-PBS, 2017 WL 1032502, at *6 (D. Mass. Mar. 16, 2017), on reconsideration in part, 254 F. Supp. 3d 253 (D. Mass. 2017).

Anderson's Letter said the second basis for discipline involved Anderson's loss of keys.  On August 17, 2012, Anderson had left her keys in the keyhole on the weapon room door at the end of her shift.  Anderson realized that she was missing her keys when she arrived for her shift the next day.  The keys were recovered and returned to her the day after that.

Anderson was instructed three times to complete an incident report about the misplaced keys.  The first two instructions came from Sergeant Pare.  Anderson did not comply.  Then-Sergeant Motrucinski also told Anderson to complete an incident report about the misplaced keys.  Anderson responded that an incident report was unnecessary because she had her keys back.  Motrucinski asked her, "Are you refusing my direct order to complete the incident report?"  Anderson replied, "yes, I refuse," and left Motrucinski's office.

On November 16, 2012, Anderson attended an EEO redress conference concerning her September 11, 2012 request for EEO pre-

---

[3]     On September 5, 2012, then-Sergeant Motrucinski asked Anderson if she had ever left her weapon locker key in the weapon locker since their discussion on July 18, 2012.  Anderson replied, "No, never."

complaint counseling.  In addition to Anderson, PPO Barris, Captain Ford, then-Sergeant Motrucinski, and an EEO mediator attended.  At the conference, Ford and Motrucinski proposed as a resolution of the matter that if Anderson resigned from her position as a PPO, her disciplinary record would be wiped clean.  They said she could then take a position as a post office clerk.  Ford and Motrucinski otherwise refused to discuss the disputes.

Barris, the other PPO at the redress conference, had further conversations with Captain Ford about Anderson's EEO activity around the same time.  In one conversation, Ford got upset about Anderson's EEO complaints and yelled, "How dare she do this to me?  I've been nothing but nice to her."  Captain Ford also said, referring to Anderson, "I want her gone.  I want her gone before I retire.  I want her gone."  And Ford screamed to Barris that he wanted "both of [them] gone" because he thought Barris was encouraging Anderson to file the complaints.

In mid-December 2012, Anderson filed another request for pre-complaint EEO counseling, charging Captain Ford and then-Sergeant Motrucinski with race discrimination and retaliation for an incident on October 19, 2012.  That incident involved Anderson's removal from the acting sergeant's list following her fourteen-day suspension.  A PPO on the acting sergeant's list may fill in to supervise a shift (though the PPO acting as sergeant has limited disciplinary authority).

On December 28, 2012, Anderson filed a formal complaint with the EEOC charging Captain Ford and then-Sergeant Motrucinski with race discrimination and retaliation.

Anderson's termination as a PPO took place about six months later. On the morning of June 6, 2013, a fire at the Brockton, Massachusetts mail processing and distribution center left the building flooded and without power. The doors were left open to air out smoke from the fire, and the side of the building had a gaping hole about 100 feet long and taller than a person. The building was in use otherwise.

At around 2:00 p.m., the inspector service decided to send PPOs to help the postal inspectors maintain building security. The PPOs were to provide a visible police presence, to prevent onlookers from getting hurt, and to prevent unauthorized access. Anderson was the first PPO to arrive, at about 2:15 p.m.

At some point in the afternoon, Postal Inspector Patricia Rebello assigned Anderson to guard the hole in the building's wall. Rebello told Anderson it was necessary to have an officer present because of the people trying to access the building. Rebello specifically instructed Anderson to stay out of her vehicle and to walk around her assigned area.

Inspector Rebello checked on Anderson that afternoon, between 4:00 p.m. and 5:00 p.m. Rebello found Anderson in the rear passenger seat of her police cruiser with her head tilted

back, appearing to be sleeping.  Rebello said it took several tries to rouse Anderson.  Rebello told her, "You're not supposed to be in here sleeping" and that "You're supposed to have officer presence.  You're not to sleep in the vehicle.  You're to be out of the vehicle."  Anderson responded, "Oh, okay.  I just sat down."

Anderson testified that she was not sleeping.  The district court credited this testimony.  See Anderson, 2017 WL 1032502, at *8.  The record includes Anderson's cell phone call log, which shows several calls between 4:00 and 5:00 p.m.  The district court found it "unlikely that [Anderson] fell asleep in the car between her phone calls."  Id.  Even so, the district court found that Anderson had disobeyed Rebello's instructions by sitting in her cruiser.  Id.

Another Postal Inspector observed Anderson, again in her cruiser, on another cell phone call at around 6:00 p.m.  Anderson did not respond to that Inspector's presence.  The district court found that "[w]hen Anderson was sitting in her cruiser, she was inattentive and could have appeared to be asleep to a passerby."  Id.

On June 12, 2013, Acting Captain Motrucinski placed Anderson on pre-investigation emergency non-pay status[4] for her

---

[4]    The Postal Service's collective bargaining agreement with its PPOs provides that a PPO "may be immediately placed in an off-duty status (without pay) by the Employer, but remain on the rolls where the allegation involves . . . failure to observe safety

"misconduct" at the Brockton facility.  The district court found this action "unwarranted as there was no emergency."[5]  Id.

While Anderson was suspended, the Postal Service Office of Inspector General (OIG) investigated the Brockton incident. The OIG interviewed Captain Motrucinski on June 25, 2013, and Anderson and several Postal Inspectors the next week.  The OIG report summarized statements by the interviewees but made no factual findings about what took place at Brockton.

On September 9, 2013, Captain Motrucinski issued Anderson a Notice of Removal for failure to perform her duties. The Notice explained:

> Despite having been placed on full and proper notice that you were to provide a Uniformed presence at the site, you were observed sitting Inside your Postal Police vehicle ('cruiser') when you should have been standing outside the cruiser as a visible presence to prohibit unauthorized access.

The Notice then conducted a penalty analysis.  It emphasized the "serious nature" of Anderson's offenses and specifically referenced three prior disciplinary actions: (1) the June 24, 2011 seven-day suspension; (2) the August 29, 2012 Letter of Warning; and (3) the September 26, 2012 fourteen-day suspension.  The Notice

---

rules and the Security Force regulations . . . .  The PPO shall remain on the rolls (non-pay status) until disposition of the case has been made."

[5]    Anderson later grieved the emergency suspension and received back pay for her period of emergency nonduty status.

concluded that "there [wa]s no penalty short of removal adequate to deter [Anderson] from such conduct in the future." Inspector-in-Charge Kevin Niland, who oversaw a seven-state region, reviewed the OIG's report and concurred in Motrucinski's decision.

At trial, the district court asked Motrucinski, "If [Anderson] had a less severe set of prior disciplinary warnings and suspensions, would you have removed her?" Motrucinski responded, "Possibly. The serious nature of the entire event that day was of great concern to me."

In November 2013, Anderson filed an EEO complaint against Captain Motrucinski challenging her removal as racially discriminatory and retaliatory. The Postal Service appears to have issued a final agency decision dismissing the complaint sometime later, but the exact details of the agency decision and its date are not in the record.

B. Procedural History

Anderson timely filed suit challenging her removal. Her federal complaint did not seek damages stemming from prior disciplinary actions taken against her (her June 2011 suspension, her August 2012 Letter of Warning, and her September 2012 suspension). And she did not dispute that her conduct during the Brockton fire warranted discipline. Her claim was that the penalty, termination of employment, was disproportionate, and resulted from discrimination, and independently, from retaliation.

- 14 -

Anderson sought reinstatement as a PPO, back pay, lost pension and medical benefits, earned sick leave, emotional distress damages, and attorney fees.

### 1.  Initial Decision

Because Anderson did not appeal from the finding against her on her discrimination claim, we focus on each side's arguments as to the district court's finding of liability on her retaliation claim.  The court determined that "Anderson's misconduct at the Brockton facility merited discipline for two legitimate, nondiscriminatory reasons": (1) Anderson's inattentiveness in the discharge of her duties, and (2) her disregard for the instructions of her supervisors during an emergent situation.  Anderson, 2017 WL 1032502, at *11.  The court then found that the penalty of removal was disproportionate and retaliatory.  Id. at *13.

The court initially reasoned, in part, that two alleged comparators -- PPOs Healey and Pasquale -- who "regularly fell asleep on duty" were not terminated and that they were allowed to retire in 2005 and 2007, respectively.  Id. at *12.  Their supervisor had imposed no discipline on them, despite the multiple occasions on which Healey and Pasquale were found sleeping, but instead simply told them to get coffee and splash water on their faces.  Id.

Healey and Pasquale both worked the "graveyard shift" and performed the type of access control now done by private

contractors. At trial, Motrucinski testified that falling asleep during "post coverage" handled by Healey and Pasquale was "less dangerous" than being inattentive during an emergent situation because post coverage involves "pretty much a static environment." Acknowledging these differences, the district court concluded that, "in light of the lax treatment of similarly situated white PPOs, [Anderson's] removal was disproportionate and supports a claim of retaliation particularly in light of the temporal proximity to Anderson's EEO complaints." Id. at *13.

The district court also found that the seven-day suspension (in 2011), which then-Sergeant Ford imposed on Anderson, "had no legitimate, non-retaliatory justification." Id. And it found that the fourteen-day suspension (in 2012) was too severe a punishment for Anderson's infractions. Id. at *16. The court then determined that if these disciplinary incidents had not been considered, "Anderson would not have been removed." Id.

These were not the only bases for the district court's finding of retaliation. Significantly, "the evidence at trial showed [the district court] that Captain Motrucinski's removal of Anderson was motivated by retaliation even if her three prior disciplinary actions were taken as a given." Anderson v. Brennan, 254 F. Supp. 3d 253, 257-58 (D. Mass. 2017).

After the evidence closed, the court permitted both sides to make simultaneous post-trial findings, but did not allow

any replies.  In her post-trial findings, Anderson stated for the first time that, while her preferred remedy was reinstatement as a PPO, she would also accept reinstatement as a full-time window clerk, a job she once held, so long as she was given twenty-one years' seniority.  Failing that, she requested five years' front pay.

The Postal Service argued in its simultaneous post-trial findings that Anderson was not entitled to reinstatement and that reinstatement would be impracticable "because of the obvious antagonistic relationship demonstrated at trial between her and her former supervisors."  The Postal Service also argued that Anderson was not entitled to monetary recovery, including front pay.

After taking these submissions, the district court concluded that reinstatement as a PPO was inappropriate because Anderson had an "irreparably antagonistic" relationship with the leaders of the "small workforce of PPOs" in the Boston area. Anderson, 2017 WL 1032502, at *17.  The court instead awarded Anderson reinstatement as a window clerk because "[r]einstatement is the 'preferred remedy under Title VII.'"  Id. (quoting Valentín-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 105 (1st Cir. 2006)).  (This would change on reconsideration.)

The court also awarded Anderson attorney fees; $223,164 for three years of back pay; and $25,000 in compensatory damages.

Id. at *19.  The court later adjusted this amount to give Anderson 3.3 years of back pay, granting her a total award of $278,760, plus attorney fees.  Anderson, 254 F. Supp. 3d at 260.

    2.   Reconsideration

The parties cross-moved for reconsideration on liability and damages.

    a.   Liability

The district court rejected the Postal Service's arguments attacking its liability finding.  Id. at 256-59.  The court explained that "the Postal Service makes a strong argument that a Title VII plaintiff should be barred from attacking an old, unchallenged retaliatory sanction that underpins a termination in a progressive discipline system."  Id. at 257.  But the court determined that it could consider these incidents as "background evidence" that Motrucinski had a retaliatory motive.  Id. at 258 (quoting United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977)).  The court noted that Captain Ford, who had ordered Anderson's first suspension, had made comments expressing his distaste for Anderson's EEO filings.  Id.  The court also noted that Motrucinski had issued the second (unjustifiably severe) suspension only two weeks after Anderson named him in an EEO pre-complaint counseling form, which the court concluded evidenced his own retaliatory animus.  Id.

"By itself," the court explained, "the fact that the Brockton incident was six months after EEO activity (and Anderson's subsequent removal was nine months removed) might not permit an inference of retaliation." Id. at 258-59. But the court found that its conclusion that Motrucinski had issued discipline it found to be in retaliation, together with "evidence that removal was a disproportionate level of discipline," supported an inference of retaliatory motive. Id. at 259.

The court also rejected the argument that Healey and Pasquale were not appropriate comparators. Id. Even acknowledging differences between those PPOs and Anderson, it found that the stark difference in their treatment supported a finding of retaliation. Id.

b. Remedy -- Denial of Reinstatement to Window Clerk with Seniority

In its motion for reconsideration, the Postal Service argued that the court's award of the newly requested relief of reinstatement of Anderson to a position as a window clerk with seniority would conflict with separate Postal Service collective bargaining agreements, which require such window clerk employees to begin a new period of seniority upon reinstatement or return to a position. It attached those collective bargaining agreements and an affidavit to that effect.

Anderson submitted an affidavit repeating her testimony that at a previous EEO redress conference she had received offers that if she settled this matter and resigned her position as a PPO the Postal Service would give her a position as a window clerk with her seniority intact. Her affidavit also stated that a representative for the PPO union told her in February 2014 that she could have a position as a Postal Service custodian, with seniority intact, in settlement of her claims.

After examining both parties' positions, the court determined "in its equitable discretion, that front pay is a more appropriate remedy than reinstatement to a window clerk position." Anderson, 254 F. Supp. 3d at 261. Since the trial record contained no evidence about how much longer Anderson -- who was then sixty-two years old -- would have worked, the court ordered the parties to supplement the record with evidence about the amount of front pay. Id. The court also allowed Anderson to file a late petition for attorney fees. Id. at 262.

c.   Remedy -- Denial of Front Pay

Anderson requested $764,360 in front pay, representing "the equivalent of eight years continued compensation by USPS less her anticipated income from alternative employment during those [eight] years." Anderson stated that there is no mandatory retirement age for PPOs. In an affidavit, she stated that she,

then nearly sixty-two years old, had intended to work until she was seventy. Anderson also sought $286,275 in attorney fees.

The Postal Service argued that the district court should not award front pay because Anderson had the opportunity, and the obligation, to present evidence regarding front pay at trial. She had failed to do so. The Postal Service also argued that the district court could not rely on post-trial supplemental evidence to award front pay unless it either reopened the record or scheduled an evidentiary hearing on front pay.[6] The Postal Service did not object to Anderson's petition for attorney fees.

On July 24, 2017, seven months after evidence had closed at trial (on December 20, 2016), the court denied Anderson's request for front pay. Anderson v. Brennan, 267 F. Supp. 3d 270, 272 (D. Mass. 2017). The court explained that it would be inappropriate to reopen the trial record without also providing "'the standard prophylaxis that generally obtains at trial,' including 'the right to object to evidence, the right to question its source, relevance, and reliability, the right to cross-examine its proponent, and the right to impeach or contradict it.'" Id. at 273 (quoting Lussier v. Runyon, 50 F.3d 1103, 1113 & n.13 (1st

---

[6] In the alternative, the Postal Service argued that the existing back-pay-damages award already made Anderson whole, that Anderson failed to mitigate her damages, that any front-pay award would be zero, and that any front-pay award would be subject to offsets.

Cir. 1995)).  The district court, rather than reopening, instead exercised its discretion "to disregard the post-trial evidence submitted by both parties on the appropriate amount of front pay" and to "rely solely on the original bench trial record."  Id.

"The trial evidence on the appropriate remedy," the court noted, was "sparse."  Id.  "There was no trial evidence on the length of time for which it would be appropriate to award front pay," "on how long Anderson intended to remain a PPO," or "on what age PPOs tend to retire."  Id.  And though Anderson's post-trial submission had claimed five years' front pay, the court could "discern no basis in the trial record for why five years would be appropriate."  Id. at 273 n.1.  "Because Anderson had full opportunity to enter trial evidence" on front pay "but failed to do so," the court decided to award no front pay, rather than speculate about its amount.  Id. at 274.  The district court did, however, grant Anderson's request for $286,275 in attorney fees.  Id.

      d.   Denial of Anderson's Motion to Alter or Amend the Judgment or for New Trial

Anderson moved to alter or amend the judgment or, in the alternative, for a new trial on remedies.  She argued that the court erred when it reconsidered its prior award of reinstatement because, in doing so, it had considered the Postal Service's collective bargaining agreements with the American Postal Workers

Union (which represents window clerks, not PPOs), which were not in the trial record. (Anderson had not previously made this argument.) Anderson also argued that the court erred by failing to consider her supplementation of the record on the issue of front pay.

Anderson made no offer of proof, and she did not offer anything to dispute the Postal Service's reading of the collective bargaining agreements. And she gave no example in which an employee had been reinstated with seniority to a window clerk position. Anderson did refer to a situation in which an employee had been reinstated with seniority to a janitorial position. She said janitors were represented by the same union as window clerks, but offered no proof that those employees were covered by the same collective bargaining agreements.

The district court rejected Anderson's arguments, and gave three reasons. Anderson v. Brennan, No. 1:14-cv-13380-PBS, slip op. at 2-3 (D. Mass. Sept. 26, 2017). First, it found Anderson had waived the argument that the court could not consider the collective bargaining agreements by failing to raise that objection in her opposition to reconsideration of reinstatement. Id. Second, the court said that, even absent Anderson's waiver, there was no error in considering the collective bargaining agreements without reopening the trial record because the documents "are subject to judicial notice." Id. at 3. Third, the

court noted that awards of front pay are discretionary, and that it acted within its discretion when it declined to reopen the evidentiary record because "Anderson had full opportunity to introduce trial evidence on the appropriate amount . . . but failed to do so."  Id.

## II.

A.   USPS Appeal from Decision on Liability for Retaliation

To bring a successful retaliation claim under Title VII, a plaintiff must prove that (1) "she engaged in protected activity under Title VII," (2) "she suffered an adverse employment action," and (3) that "the adverse employment action was causally connected to the protected activity."  Ray v. Ropes & Gray LLP, 799 F.3d 99, 107 (1st Cir. 2015) (quotation marks omitted).  In this context, a causal connection requires "but-for causation."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013).  So a Title VII plaintiff must show that her protected activity was a but-for cause of the adverse employment action against her.

The district court concluded that Captain Motrucinski had a retaliatory motive in choosing to terminate Anderson's employment as an appropriate level of discipline.  We review the factual conclusion "regarding an employer's intent" for clear error, DeCaire v. Mukasey, 530 F.3d 1, 21 (1st Cir. 2008), and must affirm "unless, after carefully reading the record and according due deference to the trial court's superior ability to

- 24 -

judge credibility, we form a strong, unyielding belief that a mistake has been made," In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 163 (1st Cir. 2009) (quoting Williams v. Poulos, 11 F.3d 271, 278 (1st Cir. 1993)).

The district court made no such mistake. It concluded that "sleeping on the job was not taken particularly seriously" "in the Boston PPO workforce." Anderson, 254 F. Supp. 3d at 258. It noted that, even beyond Boston, termination of employment of PPOs was rare: "only five or six PPOs were terminated nationwide in the past three years and nobody had been removed from the Boston PPO service at any time within any witness's recollection." Id. (emphasis added). And it considered the "history of interactions between Captain Motrucinski and Anderson," as well as the interactions between "Captain Motrucinski's predecessor, Captain Ford," and Anderson. Id. All this "strong background evidence of retaliation" led to the district court's finding "of present retaliatory motive by Motrucinski" in his treatment of Anderson. Id. at 259.

The Postal Service's arguments require no analysis because they miss the mark. The Postal Service focuses on alleged errors as to the consideration of comparators and of the prior disciplinary acts. But it ignores the district court's conclusion that, even apart from these two matters, the other evidence supported a finding of retaliation anyway.

- 25 -

Our recitation of the record provides ample support for the court's finding. We see no need to further discuss the Postal Service's arguments.

B.   Remedial Decisions

The procedural context in which the district court made its ultimate remedial decisions does warrant more discussion. We review a district court's decisions about the remedies of front pay and reinstatement, including whether to take judicial notice of facts, whether to reopen the record after trial, and whether to grant a new trial, for abuse of discretion. See Franchina v. City of Providence, 881 F.3d 32, 56 (1st Cir. 2018) (front pay); Kennedy v. Town of Billerica, 617 F.3d 520, 527 (1st Cir. 2010) (new trial); Prescott v. Higgins, 538 F.3d 32, 41 (1st Cir. 2008) (judicial notice); Valentín-Almeyda, 447 F.3d at 104 (reinstatement); Lussier, 50 F.3d at 1113 (reopen the record). In each instance, a district court has only abused its discretion if it "indulged in a serious lapse in judgment." Desrosiers v. Hartford Life & Accident Ins. Co., 515 F.3d 87, 91 (1st Cir. 2008).

In the end we cannot say that there was any abuse of discretion. Anderson had a fair and ample opportunity to present evidence and argument to the trial court during the trial, however disappointed she is that her remedy did not go beyond her $253,760 (plus prejudgment interest) back-pay award, her $25,000 compensatory-damages award, and her $286,275 attorney-fee award.

There was nothing unfair about the trial court's application of the Lussier standard to the post-trial proceedings.

### 1. Post-Trial Evidence

Anderson first argues that the district court erred in relying on what she calls post-trial "evidence" to reconsider and vacate its prior award of reinstatement to a position as a window clerk with seniority. A district court may rely on facts that are judicially noticeable even if obtained after trial. See Lussier, 50 F.3d at 1113-14.

This district court was also correct that Anderson's objection to consideration of the collective bargaining agreement is waived. A Rule 59(e) motion "is not the place to present arguments that could, and should, have been raised before the court's pulling of its judgment trigger." Markel Am. Ins. Co. v. Diaz-Santiago, 674 F.3d 21, 32 (1st Cir. 2012).[7]

Even were the argument not waived, the district court did not abuse its discretion. Generally, a court may consider "documents the authenticity of which are not disputed by the parties." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); see

_____

[7] Anderson raises her own waiver argument. She says the Postal Service should have raised its collective-bargaining-agreement-based objections to reinstatement before judgment issued. But the Postal Service had no occasion to present the collective bargaining agreement earlier because Anderson had not first requested reinstatement as a window clerk as an alternative remedy until her post-trial proposed findings and conclusions of law.

- 27 -

also Lussier, 50 F.3d at 1114. The collective bargaining agreement at issue here is just such a document. Cf. Minch v. City of Chi., 486 F.3d 294, 330 n.3 (7th Cir. 2007). Anderson raises no actual dispute about the collective bargaining agreement's authenticity. And as the Postal Service notes, the agreement is publicly available on the American Postal Workers Union's website.

In explaining why it was denying reconsideration, the district court did say that it found no collective-bargaining-agreement provision "that provides for rehire or reinstatement of a window clerk with seniority intact." Anderson, 254 F. Supp. 3d at 261. Anderson does not, even now, question the accuracy of that statement by the court. The court determined, "in its equitable discretion, that front pay [wa]s a more appropriate remedy than reinstatement to a window clerk position." Id.

2. Reopening the Record

Anderson next argues that the district court's decision not to reopen the record, combined with its statement about the collective bargaining agreement, amounted to an abuse of discretion. We have dealt with the latter part of the argument alone; it does no better in combination. A district court's decision to reopen the record "turns on flexible and case-specific criteria." Davignon v. Hodgson, 524 F.3d 91, 114 (1st Cir. 2008). These criteria include "whether (1) the evidence sought to be introduced is especially important and probative; (2) the moving

party's explanation for failing to introduce the evidence earlier is bona fide; and (3) reopening will cause no undue prejudice to the non-moving party."  Id. (quoting Rivera-Flores v. Puerto Rico Tel. Co., 64 F.3d 742, 746 (1st Cir. 1995)).

When the district court considered awarding front pay, it explained that "there is a lack of evidence in the record about the appropriate amount of front pay" and ordered the parties to supplement the record.  Anderson, 254 F. Supp. 3d at 261.  After reviewing Anderson's request and the Postal Service's objections, the district court "elect[ed] to disregard the post-trial evidence submitted by both parties on the appropriate amount of front pay" and to "rely solely on the original bench trial record."  Anderson, 267 F. Supp. 3d at 273.

We described earlier Anderson's failure to create an adequate evidentiary record at trial.  Because Anderson had "full opportunity to enter trial evidence on the appropriate amount of front pay but failed to do so," the Court awarded none.  Id. at 274.

In Lussier, we specifically stated the district court could, "if it so elects, hold the parties to their proof at trial and determine the front pay award on the existing record."  50 F.3d at 1115.  The district court followed this path.

To be clear, there could be no claim that Anderson was somehow lulled into ignoring her burden as to front pay.  The

district court explicitly raised the issue of front pay with Anderson's counsel at trial. The court asked, "how do I think about front pay, if I went that way?" The court warned that "I've got nothing. I've got one slip of paper that I can see on what she made at the Postal Police." And the district court told Anderson's counsel, "Well, I would ask that you address [front pay offsets] with respect to admissible evidence that I can look at." Anderson failed to do so.

## III.

We affirm the district court's judgments. No costs are awarded.